IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, and THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. |
| v. | ) ) | |
| FIRESTONE POLYMERS, LLC | ) ) | |
| Defendant. | ) ) | |

## **COMPLAINT**

Plaintiffs, the United States of America ("United States"), by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the Louisiana Department of Environmental Quality ("LDEQ"), by and through its undersigned attorneys, file this Complaint and allege as follows:

## **NATURE OF THE ACTION**

1.      This is a civil action brought against Firestone Polymers, LLC ("Firestone" or "Defendant") for violations of the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq*., the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq*., the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11001 *et seq*., the Pollution Prevention Act ("PPA"), 42 U.S.C. § 13101 *et seq.*,  the Louisiana Environmental Quality Act ("LEQA"), Louisiana Revised Statutes ("La. R.S.")

30:2001 *et seq.*, the regulations promulgated pursuant to those statutes, and the operating permits that incorporate those requirements.

2.     The United States and LDEQ bring this case pursuant to the following provisions: Sections 111, 112 and 113(b) of the CAA, 42 U.S.C. §§ 7411, 7412 and 7413(b); Sections 109(c)(1) and 113(b) of CERCLA, 42 U.S.C. §§  9609(c)(1) and 9613(b); Sections 325(b)(3) and 325(c)(4) of EPCRA, 42 U.S.C. §§ 11045(b)(3) and 11045(c)(4); Section 6607(c) of the PPA, 42 U.S.C. § 13106(c) (referencing Section 325(c) of EPCRA, 42 U.S.C. § 11045(c)); the LEQA, La. R.S. 30:2025 and 30:2057(A)(1) and (2); and the regulations promulgated pursuant to those statutes.

3.     This Complaint seeks injunctive relief and civil penalties based on alleged violations of the CAA, CERCLA, EPCRA, PPA, and LEQA at the Firestone facility located near Lake Charles, Louisiana at 1801 Highway 108 E, south of Interstate 10 in Sulphur, LA ("Lake Charles Facility" or "Facility"). The Facility produces, *inter alia*, synthetic rubber products. The alleged violations relate to: emission exceedances from dryers, cooling towers, and flares; rubber product sampling; heat exchanger, tank, and valve mechanical integrity; heat exchange system leak detection and repair; leaks and spills from other facility equipment; and monitoring and reporting requirements. These violations resulted in the emission of thousands of tons of illegal pollutants including nitrogen oxides ("NOx"), carbon monoxide ("CO"), volatile organic compounds ("VOC" or "VOCs"), particulate matter ("PM"), sulfur dioxide ("SO2")  and hazardous air pollutants ("HAPs") including n-hexane, 1,3-butadiene, styrene, formaldehyde, methyl isobutyl ketone, naphthalene, methyl chloride, methylene chloride, methyl ethyl ketone, toluene, carbon disulfide, and methanol into the atmosphere.

4.      The United States and LDEQ allege that Firestone has violated and/or continues to violate the following statutory and regulatory requirements:

   a.   National Emissions Standards for Hazardous Air Pollutants ("NESHAP") for Group 1 Polymers and Resins promulgated at 40 C.F.R. Part 63, Subpart U, pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, and incorporated by reference at Louisiana Administrative Code ("LAC") 33:III.Chapter 51, Subchapter C;

   b.   NESHAP for Organic Liquids Distribution (Non-Gasoline) promulgated at 40 C.F.R. Part 63, Subpart EEEE, pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, and incorporated by reference at LAC 33:III.Chapter 51, Subchapter C;

   c.   NESHAP for Stationary Reciprocating Internal Combustion Engines promulgated at 40 C.F.R. Part 63, Subpart ZZZZ, pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, and incorporated by reference at LAC 33:III.Chapter 51, Subchapter C;

   d.   NESHAP for Industrial, Commercial, and Institutional Boilers and Process Heaters promulgated at 40 C.F.R. Part 63, Subpart DDDDD, pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, and incorporated by reference at LAC 33:III.Chapter 51, Subchapter C;

   e.   New Source Performance Standards ("NSPS") for Industrial, Commercial, Institutional Steam Generating Units promulgated at 40 C.F.R. Part 60, Subpart Db, pursuant to Section 111 of the CAA, 42 U.S.C. § 7411, and incorporated by reference at LAC 33:III.Chapter 30, Subchapter A;

   f.   Title V of the CAA, 42 U.S.C. §§ 7661-7661f, the regulations promulgated thereunder at 40 C.F.R. Part 70 and 71, and LDEQ's approved Title V Program under LAC 33:III.Chapter 5; and

   g.   Federally-approved Louisiana State Implementation Plan ("SIP") provisions referenced in the May 27, 2021 Notice of Violation issued to Firestone.

5.      The United States alleges further that Firestone has violated and/or continues to violate the following statutory and regulatory requirements:

   a.   Toxic Chemical Release Form Requirements promulgated at 40 C.F.R. Part 372, pursuant to Section 313 of EPCRA, 42 U.S.C. § 11023, and pursuant to Section 6607 of the PPA, 42 U.S.C. § 13106;

      b.    Emergency Notification and Reporting Requirements of EPCRA promulgated at 40 C.F.R. Part 355, pursuant to Section 304 of EPCRA, 42 U.S.C. § 11004;

      c.    Notification and Reporting Requirements promulgated at 40 C.F.R. Part 302, pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603; and

      d.    Chemical Accident Prevention Provisions promulgated at 40 C.F.R. Part 68, Subparts D and G, pursuant to Section 112(r)(7) of the CAA, 42 U.S.C. § 7412(r)(7).

6.     LDEQ alleges further that Firestone has violated and/or continues to violate the following statutory and regulatory requirements:

      a.    Louisiana Chemical Accident Prevention Program at LAC 33:III.Chapter 59, which incorporates by reference 40 C.F.R. Part 68;

      b.    LAC 33:I - Office of the Secretary, Chapter 39 - Notification Required (Unauthorized Discharges);

      c.    LAC 33:III – Air; and

      d.    La. R.S., Title 30 – Minerals, Oil, and Gas and Environmental Quality, Section 2057 – Prohibitions; Exceptions ("La. R.S. 30:2057").

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1331, 1345, and 1355; Sections 109(c) and 113(b) of CERCLA, 42 U.S.C. §§ 9609(c) and 9613(b); Sections 325(b)(3) and 325(c)(4) of EPCRA, 42 U.S.C. §§ 11045(b)(3) and 11045(c)(4); and Section 6607(c) of the PPA (referencing Section 325(c) of EPCRA), 42 U.S.C. § 13106(c) (referencing 42 U.S.C. § 11045(c)).  This Court has personal jurisdiction over Defendant, which does business in the State of Louisiana and in this judicial district.

8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1367 over LDEQ's claims under the LEQA because those claims are so related to the claims alleged in the United States' action that they form part of the same case or controversy.

4

9.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395; Section 113(b) of the CAA, 42 U.S.C. 7413(b); Section 113(b) of CERCLA, 42 U.S.C. § 9613(b); Sections 325(b)(3) and 325(c)(4) of EPCRA, 42 U.S.C. §§ 11045(b)(3) and 11045(c)(4); and Section 6607(c) of the PPA, 42 U.S.C. § 13106(c) (referencing Section 325(c) of EPCRA), 42 U.S.C. § 11045(c), because the facility where the alleged violations occurred or are occurring is located in this District.

## NOTICE

10.      On May 27, 2021, EPA issued a Notice and Finding of Violations ("NOV") to the defendant pursuant to Section 113(a)(1) of the CAA, 42 U.S.C. § 7413(a)(1), and provided a copy of the NOV to the State of Louisiana.

11.      Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), notice of the commencement of this action has been given to LDEQ.  LDEQ is a co-Plaintiff.

12.      The 30-day period established in Section 113 of the CAA, 42 U.S.C. § 7413, between issuance of the NOV provided by the United States and the commencement of this civil action has elapsed.

## AUTHORITY

13.      The United States Department of Justice has authority to bring this action on behalf of the Administrator of EPA under, *inter alia*, 28 U.S.C. §§ 516 and 519 and also under Section 305(a) of the CAA, 42 U.S.C. § 7605(a). The authority of LDEQ to bring this action, with the concurrence of the Louisiana Attorney General, derives from  La. R.S. 30:2025(A).

14.      Effective April 7, 1995, EPA has delegated to LDEQ the authority to implement and enforce the NESHAP program.  *See* 60 Fed. Reg. 17,750 (April 7, 1995); 60 Fed. Reg.

47296 (Sept. 12, 1995); 69 Fed. Reg. 15687 (March 26, 2004); 71 Fed. Reg. 19652 (April 17, 2006); 75 Fed. Reg. 19252 (April 14, 2010); 80 Fed. Reg. 9,613 (Feb. 24, 2015).

15.     Effective January 25, 1982, EPA has delegated to LDEQ the authority to implement and enforce the NSPS program. *See* 47 Fed. Reg. 7665 (Feb. 22, 1982); 69 Fed. Reg. 15687 (March 26, 2004); 75 Fed. Reg. 19252 (April 14, 2010); 80 Fed. Reg. 9,613 (Feb. 24, 2015).

16.     Effective October 12, 1995, EPA has approved Louisiana's Title V operating permit program ("Operating Permit Program"). *See* 40 C.F.R. Part 70, Appendix A; 60 Fed. Reg. 47,296 (Sept. 12, 1995).  LDEQ's approved Operating Permit Program is located at LAC 33:III.Chapter 5 ("Permit Procedures").

17.     Notwithstanding delegation to the State of the NSPS and NESHAP programs, EPA retains authority, concurrent with the State, to enforce the NSPS and NESHAP programs. *See* Sections 111(c)(2) and 112(l)(7) of the CAA, 42 U.S.C. §§ 7411(c)(2) and 7412(l)(7). Notwithstanding approval of Louisiana's Operating Permit Program, EPA retains the authority, concurrent with the State, to enforce any regulation promulgated or permit promulgated, issued, or approved under Title V of the CAA. *See* Section 113(a)(3) of the Act, 42 U.S.C. § 7413(a)(3).

## **DEFENDANT**

18.     Defendant, Firestone, is a limited liability company formed in the State of Delaware and registered to do business in the State of Louisiana.

19.     Defendant owns and operates the Lake Charles Facility along Highway 108 in Sulphur, Louisiana that produces synthetic rubber products and employs approximately 300 persons.

20.     Firestone is a "person" within the meaning of Sections 113(b) and 302(e) of the CAA, 42 U.S.C. §§ 7413(b) and 7602(e); Sections 101(21) and 103(a) of CERCLA, 42 U.S.C. §§ 9601(21) and 9603(a); Section 329(7) of EPCRA, 42 U.S.C. § 11049(7); La. R.S. 30:2004(11); and the applicable federal and state regulations.

21.     At all times pertinent to this suit, Firestone has been an "owner or operator" of the Facility within the meaning of Section 112(a)(9) of the CAA, 43 U.S.C. § 7412(a)(9); Section 111(a)(5) of the CAA, 43 U.S.C. § 7411(a)(5); Sections 304(a)-(c) and 313 of EPCRA, 42 U.S.C. §§ 11004(a)-(c) and 11023; and the applicable federal and state regulations.

## FACILITY DESCRIPTION

22.     Defendant makes approximately 25 polybutadiene rubber (PBR) and styrene-butadiene rubber (SBR) products at the Facility.

23.     The Facility includes the following emissions sources that are relevant to this Complaint:

a.  <u>Drying Lines</u>: Drying Line 18 (EQT001); Drying Line 20 (EQT002); Drying Line 21 (EQT003); Drying Line 22 (EQT004); and Drying Line 23 (EQT005);

b.  <u>Heat Exchange Systems</u>: North Cooling Tower (EQT0014) and the South Cooling Tower (EQT0015) and accompanying heat exchangers (the Facility has approximately 139 heat exchangers);

c.  <u>Flares</u>: 96-03a Primary Flare (EQT 0011) ("Primary Flare"); and 96-03b Auxiliary Flare (EQT 0012) ("Auxiliary Flare");

d.  <u>Boilers</u>: Boiler No. 8 (EQT 0009); B-100 Natural Gas Boiler (EQT 0054); and B-900 Natural Gas Boiler (EQT 0052);

e.  <u>Engines</u>: PE-07 Emergency Firewater Pump Engine (Diesel) (EQT 0055); PE-08 Emergency Firewater Pump Engine (EQT 0056); PE-09 Emergency Well Water Pump Engine (EQT 0057); PE-10 Stormwater Effluent Pump; PE-11 Effluent Emergency Generator PE-11; and

f. <u>Tanks</u>: storage tank F-431; catalyst knock-out tank F-322; boron trifluoride complex feed tank F-458; 1,3-butadiene storage sphere F-133; low pressure Storage Vessel F-148; portable nitropropane tank, F-712; and Tank 35.

## **STATUTORY AND REGULATORY BACKGROUND**

### I.   **CLEAN AIR ACT**

24.    The CAA establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. Section 101(b)(1) of the CAA, 42 U.S.C. § 7401(b)(1).

### A.   **National Emission Standards for HAPs**

25.    Section 112 of the CAA sets forth a national program for the control of HAPs. 42 U.S.C. § 7412. As originally promulgated in the CAA Amendments of 1970, Section 112 directed EPA to publish a list of HAPs. A HAP was defined as "an air pollutant to which no ambient air quality standard is applicable and which in the judgment of the Administrator may cause, or contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness." 42 U.S.C. § 1857c-7. At that time, Congress directed EPA to establish HAP standards that provided "an ample margin of safety to protect the public health from such hazardous air pollutant." *Id*.

26.    Between 1970 and 1990, EPA listed eight substances as HAPs and promulgated emission standards for seven of them. H.R. Rep. No. 101-490, 101st Cong., 2d Sess., pt 1 at 151 (1990).

27.    Through the CAA Amendments of 1990, Congress replaced the then-existing Section 112 and established a new program for the control of HAPs codified at 42 U.S.C. § 7412(b). H.R. Rep. No. 101-490, 101st Cong., 2d Sess., pt 1 at 324 (1990). The regulations then in existence under the original Section 112 remained in full force and effect.

28.     With the 1990 amendments, Congress established a list of 188 HAPs believed to cause adverse health or environmental effects. Section 112(b)(1) of the CAA, 42 U.S.C. § 7412(b)(1).

29.     "Major source" was and is defined as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year (TPY) or more of any HAP or 25 TPY or more of any combination of HAPs.  42 U.S.C. § 7412(a)(1); 40 C.F.R. § 63.2.

30.     "Stationary source" is defined as any building, structure, facility, or installation which emits or may emit any air pollutant.  42 U.S.C. § 7412(a)(3) (stating that "stationary source" under Section 112(a) has the same meaning as that term has under Section 111(a) of the CAA, 42 U.S.C. § 7411(a)(3)); 40 C.F.R. § 63.2.

31.     "Category" of sources is a group of sources having some common features suggesting that they should be regulated in the same way and on the same schedule.  57 Fed. Reg. 31576, 31578 (July 16, 1992).  A single stationary source can be comprised of multiple source categories.  *Id.*

32.     Pursuant to Section 112(d)(1) of the CAA, 42 U.S.C. § 7412(d)(1), EPA was required to promulgate regulations establishing emission standards for categories and sub-categories of, *inter alia*, major sources of HAPs.

33.     These emission standards must require the maximum degree of reduction in emissions of HAPs that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for the new or existing sources in the category or subcategory to which the emission standard applies.  42 U.S.C. § 7412(d)(2).

34.     Under Section 112(h) of the CAA, 42 U.S.C. § 7412(h), to the extent that it is not feasible to prescribe or enforce an emission standard for control of a HAP, Congress authorized EPA to promulgate "design, equipment, work practice, or operational" standards, which are to be treated as emission standards.

35.     The emission standards under Section 112 of the CAA, 42 U.S.C. § 7412, are known as the NESHAP for Source Categories or maximum achievable control technology ("MACT") standards.  These emission standards are found in Part 63 of Title 40 of the Code of Federal Regulations.

36.     After the effective date of any emission standard, limitation or regulation promulgated pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, no person may operate such source in violation of such standard, limitation, or regulation.  42 U.S.C. § 7412(i)(3).

1.   NESHAP Subpart A: General Standards (including standards that regulate flares)

37.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated regulations that apply to stationary sources of HAPs that are subject to the NESHAP standards, regardless of their source category. These general NESHAP standards are found at 40 C.F.R. Part 63, Subpart A, §§ 63.1–63.16.

38.     The NESHAP standards in Part 63 explicitly identify which specific provisions of the general standards in NESHAP Subpart A apply or do not apply to to which category. *See* 40 C.F.R. § 63.1(a)(4)(i).

39.     Under NESHAP Subpart A, the provisions of 40 C.F.R. Part 63 "apply to the owner or operator of any stationary source that (i) emits or has the potential to emit any HAP listed in or pursuant to section 112(b) of the CAA; and (ii) is subject to any standard, limitation,

prohibition, or other federally enforceable requirement established pursuant to this part." 40

C.F.R. § 63.1(b).

40.     NESHAP Subpart A regulations include requirements that apply to flares that are

used as control devices for affected sources subject to a NESHAP standard. *See* 40 C.F.R.

§ 63.11(b). The NESHAP Subpart A regulations require, *inter alia*, that:

> a.  Flares must be designed and operated with no visible emissions, 40 C.F.R.
>     § 63.11(b)(4);
>
> b.  Flares must be operated so that the gas being combusted has a net heating
>     value of 300 British thermal units ("BTU") per standard cubic feet ("scf") or
>     greater, 40 C.F.R. § 63.11(b)(6)(ii); and
>
> c.  Flares must be operated in accordance with exit velocity requirements, 40
>     C.F.R. §§ 63.11(b)(7).

   2.  <u>NESHAP Subpart U: Group 1 Polymers and Resins</u>

41.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated

standards for the production of Group 1 Polymers and Resins ("Subpart U"), 61 Fed. Reg.

46,906 (Sept. 5, 1996), including the production of polybutadiene rubber and styrene butadiene

rubber by solution.  Subpart U standards are set forth at 40 C.F.R. Part 63, Subpart U. 40 C.F.R.

§§ 63.480-63.507.

   *i.  Definitions and Applicability*

42.     Under 40 C.F.R. § 63.480(a), an "affected source" is a group of one or more

elastomer product process units ("EPPU") and associated equipment.  An affected source is

either an "existing affected source" or a "new affected source."

43.     Under 40 C.F.R. § 63.480(a)(2), an "existing affected source" is each group of

one or more EPPU and associated equipment, as listed in paragraph 40 C.F.R. § 63.480(a)(4),

that is not part of a new affected source, as defined in paragraph 40 C.F.R. § 63.480(a)(3), that is

manufacturing the same primary product and that is located at a plant site that is a major source. 40 C.F.R. § 63.480(a)(2).

44.     Under 40 C.F.R. § 63.482, an EPPU is a collection of equipment assembled and connected by hard-piping or duct work, used to process raw materials and to manufacture an elastomer product as its primary product. This collection of equipment includes: unit operations; recovery operations equipment; process vents; storage vessels, as determined pursuant to 40 C.F.R. § 63.480(g); equipment that is identified in 40 C.F.R. § 63.149; and the equipment that is subject to the equipment leak provisions as specified in 40 C.F.R. § 63.502. An EPPU consists of more than one unit operation.

45.     Under 40 C.F.R. § 63.480(a)(3), a source is a "new affected source" if, *inter alia*, construction or reconstruction of the source commenced after June 12, 1995.

46.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, 1,3-butadiene, n-hexane, and styrene are HAPs. 42 U.S.C. § 7412(b)(1).

*ii.  Operating Requirements*

47.     Pursuant to 40 C.F.R. § 63.483, the owner or operator must operate and maintain any affected source subject to the requirements of Subpart U, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions. The general duty to minimize emissions does not require the owner or operator to make any further efforts to reduce emissions if levels required by this standard have been achieved. Determination of whether such operation and maintenance procedures are being used is based on information available to the Administrator which may include, but is not limited to, monitoring results, review of operation and

maintenance procedures, review of operation and maintenance records, and inspection of the source. 40 C.F.R. § 63.483(a).

48.     Pursuant to 40 C.F.R. § 63.484, the owner or operator of a facility with assigned Group 1 storage vessels (*e.g.*, tanks), as defined at 40 C.F.R. § 63.111 of NESHAP Subpart G, must comply with the requirements of NESHAP Subpart G (40 C.F.R. §§ 63.119 through 63.123), including meeting HAP limits and conducting maintenance activities.

### iii.  Emission Limit

49.     Pursuant to 40 C.F.R. § 63.494(a)(2)(i), an owner or operator that produces PBR or SBR at an existing affected source must ensure that back-end processes do not emit residual HAPs that exceed a monthly weighted average of 10 kilograms ("kg") total organic HAP per megagram ("Mg") crumb rubber (dry weight).

### iv.  Sampling Requirements

50.     Pursuant to 40 C.F.R. § 63.495(a), an owner or operator that complies with residual organic HAP limitations in 40 C.F.R. § 63.494(a)(1) through (3) using stripping technology must demonstrate compliance using the periodic sampling procedures in 40 C.F.R. § 63.495(b).

51.     Pursuant to 40 C.F.R. § 63.495(b), an owner or operator that elects to use stripping technology in "continuous mode" must demonstrate compliance with residual organic HAP limitations by taking at least one representative sample each operating day.

52.     Pursuant to 40 C.F.R. § 63.505(i), an owner is allowed one excused "excursion" for each control or recovery device for each semiannual reporting period.

53.     An excursion occurs when less than 75 percent of the daily samples required in one month are taken and analyzed in accordance with the provisions of 40 C.F.R. § 63.495(b). 40 C.F.R. § 63.505(h)(1)(ii).

54.     The owner or operator must use daily samples to determine a single monthly weighted average for all back-end process operations at the affected source. 40 C.F.R. § 63.495(a).

55.     This weighted average is used to demonstrate compliance with the NESHAP emission standard of 10 kg total organic HAP/Mg crumb rubber (dry weight) specified in 40 C.F.R. § 63.494(a)(2)(i) for SBR and PBR produced by the solution process. 40 C.F.R. § 63.494(a)(2)(i).

56.     Pursuant to 40 C.F.R. § 63.506(e)(6)(iii)(B), Subpart U Periodic Reports of an owner or operator must include excursions caused by lack of monitoring data, and the start-time and duration of periods when monitoring data were not collected must be specified.

### v.  Equipment Leak Provisions

57.     Pursuant to 40 C.F.R. § 63.502, an owner or operator under NESHAP Subpart U must comply with requirements of Subpart H, including those discussed below.

58.     Pursuant to 40 C.F.R. § 63.172(j), for each closed-vent system that contains bypass lines that could divert a vent stream away from the control device and to the atmosphere, the owner or operator must install, set or adjust, maintain, and operate a flow indicator that takes a reading at least once every 15 minutes; alternatively, the owner or operator must secure the bypass line valve in the non-diverting position with a car-seal or a lock-and-key type configuration and visually inspect the seal or closure mechanism at least once every month to

ensure the valve is maintained in the non-diverting position and the vent stream is not diverted through the bypass line.

### vi.  Leak Reporting Requirements

59.     Pursuant to 40 C.F.R. § 63.506(e)(6), the owner or operator must submit periodic reports, which must be submitted semiannually no later than 60 days after the end of each 6-month period.

60.     Pursuant to 40 C.F.R. § 63.506(e)(6), for equipment leaks subject to 40 C.F.R. § 63.502, the owner or operator must submit Subpart U Periodic Reports containing the information specified in 40 C.F.R. § 63.182(d).

61.     Pursuant to 40 C.F.R. § 63.182(d), the owner or operator must submit leak information related to, for example, valves, pumps, compressors, and agitators.

### vii. Heat Exchange System Requirements

62.     A "heat exchange system" is any cooling tower system or once-through cooling water system (*e.g.*, river or pond water). A heat exchange system can include more than one heat exchanger and can include an entire recirculating or once-through cooling system. 40 C.F.R. § 63.482(a) (by reference to 40 C.F.R. § 63.101).

63.     Pursuant to 40 C.F.R. § 63.502(n), the owner or operator must comply with the requirements of 40 C.F.R. § 63.104 for heat exchange systems. Pursuant to 40 C.F.R. § 63.104(b)(1), the owner or operator must monitor the cooling water of each heat exchange system monthly for the first six months and quarterly thereafter to detect leaks.

64.     Pursuant to 40 C.F.R. § 63.104(b)(3), the concentration of the monitored substance(s) in the cooling water must be determined using any EPA-approved method listed in

Part 136 of Title 40, Chapter I as long as the method is sensitive to concentrations as low as 10 parts per million and the same method is used for both entrance and exit samples.

65.     Pursuant to 40 C.F.R. § 63.104(b)(6), an owner or operator is responsible for identifying a leak when: (1) the exit mean concentration is found to be greater than the entrance mean using a one-sided statistical procedure at the 0.05 level of significance; and (2) the amount by which it is greater is at least one part per million or 10 percent of the entrance mean, whichever is greater.

66.     Pursuant to 40 C.F.R. § 63.104(d)(1) and LAC 33:III.5122.A, the owner or operator that monitors the cooling water for the presence of one or more organic HAPs or other representative substances must repair a leak as soon as practical but not later than 45 calendar days after the owner or operator receives results of monitoring tests indicating a leak.

67.     Pursuant to 40 C.F.R. § 63.104(e), the owner or operator may place the heat exchange system on delay of repair if repair is technically infeasible and a shutdown is expected within the next two months.

68.     Pursuant to 40 C.F.R. § 63.104(d)(2), the owner or operator must confirm that the heat exchange system has been repaired within seven calendar days of the repair or startup, whichever is later.

69.     Pursuant to 40 C.F.R. § 63.506(e)(5), the owner or operator is required to submit applicability determinations in a Notification of Compliance Status ("NOCS") for all emission points, including heat exchange systems no later than 150 days after the compliance dates specified in NESHAP Subpart U.

70.     Pursuant to 40 C.F.R. § 63.481(c), existing affected sources must be in compliance with NESHAP Subpart U no later than June 19, 2001.

###### viii.        *Flare Requirements*

71.     A "flare" is a combustion device lacking an enclosed combustion chamber that uses an uncontrolled volume of ambient air to burn gases.

72.     Pursuant to 40 C.F.R. § 63.483(a), the owner or operator is required to operate and maintain any affected source subject to the requirements of the subpart, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions, and implement operating and maintenance procedures that ensure compliance with the standard.

73.     Pursuant to 40 C.F.R. § 63.483(a), the general duty to minimize emissions does not require the owner or operator to make any further efforts to reduce emissions if levels required by this standard have been achieved. Determination of whether such operation and maintenance procedures are being used is based on information available to the Administrator which may include, but is not limited to, monitoring results, review of operation and maintenance procedures, review of operation and maintenance records, and inspection of the source. 40 C.F.R. § 63.483(a).

###### ix.  *Wastewater Requirements*

74.     Pursuant to 40 C.F.R. § 63.501(a) (referencing 40 C.F.R. § 63.132), the owner or operator must determine whether each wastewater stream requires control for compounds listed in Table 9 of 40 C.F.R. Subpart G.

###### x.  *Recordkeeping Requirements*

75.     Pursuant to 40 C.F.R. § 63.506(a), the owner or operator must keep copies of all applicable records and reports required by NESHAP Subpart U for at least five years.

76.     Pursuant to 40 C.F.R. § 63.506(b), the owner or operator must have a recordkeeping system set up to comply with applicable recordkeeping and reporting requirements including, but not limited to, the requirements specified in paragraph 40 C.F.R. § 63.506(b)(1).

77.     Pursuant to 40 C.F.R. § 63.506(b)(1), the owner or operator must maintain records of the occurrence and duration of each malfunction of operation (*i.e.*, process equipment), air pollution control equipment, or monitoring equipment. Each owner or operator must maintain records of actions taken during periods of malfunction to minimize emissions in accordance with 40 C.F.R. § 63.483(a)(1), including corrective actions to restore malfunctioning process and air pollution control and monitoring equipment (*e.g.*, heat exchangers) to its normal or usual manner of operation.

### 3.     NESHAP Subpart EEEE: Organic Liquids Distribution (Non-Gasoline)

78.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated standards for organic HAPs emitted from organic liquids distribution ("OLD") (non-gasoline) operations at major sources of HAP emissions, 69 Fed. Reg. 5038 (Feb. 3, 2004). Subpart EEEE standards are set forth at 40 C.F.R. Part 63, EEEE. 40 C.F.R. §§ 63.2330-63.2406.

79.     Under 40 C.F.R. § 63.2406, an "organic liquids distribution operation" is the combination of activities and equipment used to store or transfer organic liquids into, out of, or within a plant site regardless of the specific activity being performed. Activities include, but are not limited to, storage, transfer, blending, compounding, and packaging.

80.     Under 40 C.F.R. § 63.2406 (by reference to 40 C.F.R. § 63.2), a "major source" is any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10

tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs, unless the Administrator establishes a lesser quantity, or in the case of radionuclides, different criteria from those specified in this sentence.

81.     Under 40 C.F.R. § 63.2338, an "affected source" includes: all storage tanks storing organic liquids; all transfer racks at which organic liquids are loaded into or unloaded out of transport vehicles and/or containers; all equipment leak components in organic liquids service that are associated with, *inter alia*, transfer racks loading or unloading organic liquids; all transport vehicles while they are loading or unloading organic liquids at transfer racks subject to this subpart; and all containers while they are loading or unloading organic liquids at transfer racks subject to this subpart.

82.     An "existing affected source" is not a "new affected source," which is an affected source where construction commenced after April 2, 2002.

83.     Under 40 C.F.R. § 63.2338, an owner or operator of an "affected source" must comply with the requirements of the subpart.

84.     Under 40 C.F.R. § 63.2342(b)(1), an owner or operator of an existing affected source must comply with NESHAP Subpart EEEE no later than February 5, 2007.

### 4.   NESHAP Subpart ZZZZ: Stationary Reciprocating Internal Combustion Engines

85.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated standards for HAPs emitted from any stationary reciprocating internal combustion engine ("stationary RICE") located at major and area sources of HAP emissions ("Subpart ZZZZ"), 73 Fed. Reg. 3,568 (January 18, 2008).  Subpart ZZZZ standards are set forth at 40 C.F.R. Part 63, Subpart ZZZZ. 40 C.F.R. §§ 63.6580-63.6675.

#### i.   *Definitions and Applicability*

86.     Under 40 C.F.R. § 63.6585(a), a "stationary RICE" is any internal combustion engine that uses reciprocating motion to convert heat energy into mechanical work and which is not mobile. A stationary RICE differs from a mobile RICE in that a stationary RICE is not a non-road engine as defined at 40 C.F.R. § 1068.30 and is not used to propel a motor vehicle or a vehicle used solely for competition.

87.     Under 40 C.F.R. § 63.6585(b), a "major source of HAP emissions" is a plant site that emits or has the potential to emit any single HAP at a rate of 10 tons or more per year or any combination of HAP at a rate of 25 tons or more per year.

88.     Under 40 C.F.R. § 63.6590, an "affected source"  is any existing, new, or reconstructed stationary RICE located at a major or area source of HAP emissions, excluding a stationary RICE being tested at a stationary RICE test cell/stand.

89.     Pursuant to 40 C.F.R. § 63.6605(a), an owner or operator of a stationary RICE must be in compliance with the emission limitations, operating limitations, and other requirements in NESHAP Subpart ZZZZ that apply to that owner or operator at all times.

5.  <u>NESHAP Subpart DDDDD: Industrial, Commercial, and Institutional Boilers and Process Heaters</u>

90.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated standards for HAPs emitted from industrial, commercial, and institutional boilers and process heaters located at major sources of HAPs ("Subpart DDDDD"), 76 Fed. Reg. 15,608 (March 21, 2011), including the production of polybutadiene rubber and styrene butadiene rubber by solution.  Subpart DDDDD standards are set forth at 40 C.F.R. Part 63, Subpart DDDDD. 40 C.F.R. §§ 63.7480-63.7575.

*i.   Definitions and Applicability*

91.     Under 40 C.F.R. § 63.7490, an "affected source" includes all industrial, commercial, and institutional boilers and process heaters.

92.     Under 40 C.F.R. § 63.7575, an "industrial boiler" is a boiler used in manufacturing, processing, mining, and refining or any other industry to provide steam, hot water, and/or electricity.

93.     Under 40 C.F.R. § 63.7485, a "major source of HAP" is as defined in 40 C.F.R. § 63.2. Under 40 C.F.R. § 63.2, a "major source" is any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs, unless the Administrator establishes a lesser quantity, or in the case of radionuclides, different criteria from those specified in this sentence.

*ii.   Compliance Reports*

94.     Pursuant to 40 C.F.R. § 63.7540(a)(12), an owner or operator of a boiler must conduct a tune-up of the boiler or process heater every five years as specified in paragraphs 40 C.F.R. § 7540(a)(10)(i) through (vi) to demonstrate continuous compliance if that boiler has: a continuous oxygen trim system that maintains an optimum air-to-fuel ratio, or a heat input capacity of less than or equal to 5 million BTU per hour ("BTU/hr") and the unit is in the units designed to burn gas 1; units designed to burn gas 2 (other); or units designed to burn light liquid subcategories, or meets the definition of limited-use boiler or process heater in 40 C.F.R. § 63.7575.

95.     Pursuant to 40 C.F.R. § 63.7540(a)(10)(v), the owner or operator must measure the concentrations in the effluent stream of carbon monoxide ("CO") in parts per million, by

volume, and oxygen in volume percent, before and after the adjustments are made (measurements may be either on a dry or wet basis, as long as it is the same basis before and after the adjustments are made).

96.     Pursuant to 40 C.F.R. § 63.7540(a)(10)(vi), the owner or operator must maintain records on-site and submit a report containing, *inter alia*, the concentrations of CO in the effluent stream in parts per million by volume, and oxygen in volume percent, measured at high fire or typical operating load, before and after the tune-up of the boiler or process heater.

**B.     Chemical Accident Prevention (CAA 112(r)(7))**

97.     Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), provides that the objective of the regulations and programs authorized under Section 112(r) shall be to prevent the accidental release of regulated substances or other extremely hazardous substances and to minimize the consequences of any such release that does occur.

98.     Pursuant to CAA§ 112(r)(7), 42 U.S.C. § 7412(r)(7), the Administrator is authorized to promulgate regulations prescribing release prevention, detection, and correction requirements.

99.     On June 20, 1996, EPA promulgated a final rule known as the Chemical Accident Prevention Provisions, 40 C.F.R. Part 68, which implements Section 112(r)(7), 42 U.S.C. § 7412(r)(7), of the CAA.

**1.     CAA 112(r): Definitions and Applicability**

100.    Pursuant to 40 C.F.R. § 68.10, an owner or operator of a stationary source that has more than a threshold quantity of a regulated substance in a process, as determined under 40 C.F.R. § 68.115, must comply with the requirements of Part 68.

101.    Pursuant to 40 C.F.R. § 68.3, a "stationary source" is any buildings, structures, equipment, installations, or substance emitting stationary activities from which an accidental release may occur.

102.    Pursuant to 40 C.F.R. § 68.3, a "regulated substance" is any substance listed pursuant to Section 112(r)(3) of the CAA, 42 U.S.C. § 7412 (as amended) in 40 C.F.R. § 68.130.

103.    Pursuant to 40 C.F.R. § 68.130, 1,3-butadiene is a regulated substance.

104.    Pursuant to 40 C.F.R. § 68.130, an owner or operator of a stationary source has a threshold quantity of 1,3-butadiene if the total quantity of 1,3-butadiene in a process exceeds 10,000 pounds.

105.    Pursuant to 40 C.F.R. § 68.130, boron trifluoride is a regulated substance.

106.    Pursuant to 40 C.F.R. § 68.130, the threshold quantity for trifluoride is 5,000 pounds.

107.    A "process" is any activity involving a regulated substance including any use, storage, manufacturing, handling, or on-site movement of such substances, or combination of these activities. 40 C.F.R. § 68.3.

108.    Part 68 establishes requirements that apply to an owner or operator based on whether the stationary source operates processes subject to one of three programs: Program 1, Program 2, and Program 3.

109.    A covered process is eligible for *Program 1* requirements if, *inter alia*, the distance from the stationary source to a toxic or flammable endpoint for a worst-case release assessment is less than the distance from the stationary source to any public receptor. 40 C.F.R. § 68.10(f)(2).

110.    A covered process is subject to *Program 3* if the process is not eligible for Program 1 and if the process is subject to the OSHA process safety management standard at 29 C.F.R. § 1910.119. 40 C.F.R. § 68.10(h).

111.    Pursuant to 40 C.F.R. § 68.12(d)(3), the owner or operator of a stationary source with a process subject to the Program 3 requirements of the Part 68 regulations must implement the chemical accident prevention requirements of 40 C.F.R. Part 68, Subpart D (Program 3 Prevention Program at 40 C.F.R. §§ 68.65-68.87) and submit risk management plans that include Program 3 process elements in 40 C.F.R. Part 68, Subpart G (Risk Management Plan at 40 C.F.R. §§ 68.150-68.195).

2.    CAA 112(r)(7), Subpart D: Program 3 Requirement – Mechanical Integrity

112.    Pursuant to 40 C.F.R. § 68.73(d), the owner or operator must perform inspections and testing on process equipment such as pressure vessels, storage tanks, and pressure relief devices.

113.    The owner or operator must perform inspections and testing on the process equipment using inspection and testing procedures that follow recognized and generally accepted good engineering practices. 40 C.F.R. § 68.73(d)(2).

114.    The frequency and testing of the process equipment "shall be consistent with applicable manufacturers' recommendations and good engineering practices, and more frequently if determined to be necessary by prior operating experience." 40 C.F.R. § 68.73(d)(3).

115.    American Petroleum Institute 510 – Pressure Vessel Inspection Code: In-Service Inspection, Rating, Repair, and Alteration ("API 510") is the recognized and generally accepted good engineering practices standard for pressure vessels and pressure relief devices.

i.    *Pressure Vessels including* Heat Exchangers

24

116.    Pursuant to API 510, pressure vessels, including heat exchangers, must be inspected pursuant to Sections 6.4.1 and 6.5.1.1 of API 510.

117.    Pursuant to Section 6.4.1 of API 510, a visual external inspection must be conducted at an interval that does not exceed the lesser of five years or the required internal/on-stream inspection.

118.    Pursuant to Section 6.5.1.1 of API 510, an internal or on-stream inspection must be conducted at an interval that does not exceed the lesser of one half the remaining life of the vessel or 10 years.

*ii.   Pressure Relief Devices*

119.    Pursuant to API 510, pressure relief devices must be inspected pursuant to Section 6.6.2.2 of API 510.

120.    Pursuant to Section 6.6.2.2 of API 510, unless documented experience and/or a risk-based inspection ("RBI") indicates that a longer interval is acceptable, test and inspection intervals for pressure-relieving devices in typical process services should not exceed five years.

*iii.   Low Pressure Storage Tanks*

121.    In accordance with manufacturer's recommendations and good engineering practices, low pressure storage tanks should be inspected pursuant to API Recommended Practice 575 (Inspection Practices for Atmospheric and Low Pressure Storage Tanks).

122.    The interval from initial service of a low pressure storage tank until the initial internal inspection shall not exceed 10 years.

3.    <u>CAA 112(r)(7), Subpart D: Program 3 Requirement – Process Hazard Analysis</u>

123.     Pursuant to 40 C.F.R. § 68.67(f), at least every five years after the completion of the initial process hazard analysis ("PHA"), the PHA that was conducted for each covered process must be updated and revalidated.

124.     Pursuant to 40 C.F.R. § 68.3, "process" means any activity involving a regulated substance including any use, storage, manufacturing, handling, or on-site movement of such substances, or combination of these activities. For the purposes of this definition, any group of vessels that are interconnected, or separate vessels that are located such that a regulated substance could be involved in a potential release, must be considered a single process.

125.     Pursuant to 40 C.F.R. § 68.79(a), the owner or operator must certify that it has evaluated compliance with the provisions of Subpart D at least every three years to verify that procedures and practices developed under this subpart are adequate and are being followed.

            4.      CAA 112(r)(7), Subpart D: Program 3 Requirement – Operating
                    Procedures

126.     Pursuant to 40 C.F.R. § 68.69(b), the owner or operator must ensure that operating procedures are readily accessible to employees who work in or maintain a process.

            5.      CAA 112(r)(7), Subpart G: Risk Management Plan - Registration

127.     Pursuant to 40 C.F.R. § 68.160(b)(6), the owner or operator must provide the email address of the emergency contact when submitting the facility's risk management plan.

            6.      CAA 112(r)(7), Subpart G: Risk Management Plan – Required
                    Corrections

128.     Pursuant to 40 C.F.R. § 68.165, the owner or operator must submit in its risk management plan an offsite consequence analysis that includes one worst-case release scenario to represent all regulated toxic substances held above the threshold quantity and one worst-case release scenario to represent all regulated flammable substances held above the threshold

quantity. The owner or operator must include data such as: chemical name, percentage weight of the chemical in a liquid mixture (toxics only), scenario (explosion, fire, toxic gas release, or liquid spill and evaporation), quantity released in pounds, release rate, and release duration.

129.   Pursuant to 40 C.F.R. § 68.195, if the owner or operator of a stationary source for which a risk management plan was submitted changes the emergency contact information for a facility, then the owner or operator must submit a correction of that information within one month of the change.

### C.   New Source Performance Standards

130.   CAA Section 111(b)(1)(A), 42 U.S.C. § 7411(b)(1)(A), requires EPA to publish and periodically revise a list of categories of stationary sources that, in EPA's judgment, cause or contribute significantly to air pollution which may reasonably be anticipated to endanger public health or welfare. These categories generally correspond to distinct manufacturing processes or equipment within a given industry. For example, 40 C.F.R. Part 60, Subpart Db applies to industrial, commercial, and institutional steam generating units.

131.   Once a category is included on the list, Section 111(b)(1)(B) of the CAA, 42 U.S.C. §7411(b)(1)(B), requires EPA to promulgate a federal New Source Performance Standard to regulate emissions from new sources within the category.

132.   "New source" is defined as any stationary source for which construction or modification is commenced after an applicable NSPS is published or proposed. 42 U.S.C. § 7411(a)(2).

133.   "Stationary source" is defined as a building, structure, facility, or installation which emits, or may emit, any air pollutant. 42 U.S.C. § 7411(a)(3).

134.    The NSPS are located at 40 C.F.R. Part 60. Pursuant to 40 C.F.R. § 60.1, the provisions of Part 60 apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the publication in Part 60 of any NSPS (or, if earlier, the date of publication of any proposed NSPS) applicable to that facility.

135.    "Affected facility" is defined as any apparatus to which a standard is applicable. 40 C.F.R. § 60.2.

136.    CAA Section 111(e), 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source from operating that source in violation of an NSPS after the effective date of the NSPS applicable to such source.

1.    NSPS Subpart Db: Industrial, Commercial, Institutional Steam Generating Units

137.    Pursuant to 111(b)(1)(B), 42 U.S.C. §7411(b)(1)(B), EPA promulgated standards for industrial, commercial, and institutional steam generating units, ("Subpart Db"). *See* 72 Fed. Reg. 32,710 (June 13, 2007). Subpart Db standards are set forth at 40 C.F.R. Part 60, Subpart Db. 40 C.F.R. §§ 60.40b-60.49b.

*i.    Definitions and Applicability*

138.    Under 40 C.F.R. § 60.40b, an "affected facility" is a steam generating unit that commences construction, modification, or reconstruction after June 19, 1984, and that has a heat input capacity from fuels combusted in the steam generating unit of greater than 29 megawatts ("MW") (100 million BTU per hour ("MMBTU/hr")).

139.    Under 40 C.F.R. § 60.40b, a "steam generating unit" is a device that combusts any fuel or byproduct/waste and produces steam or heats water or heats any heat transfer medium.

*ii.   Reporting and Recordkeeping Requirements*

140.     Under 40 C.F.R. § 60.49b(c), the owner or operator of each affected facility subject to the nitrogen oxides ("NOx") standard in 40 C.F.R. § 60.44b who seeks to demonstrate compliance with those standards through the monitoring of steam generating unit operating conditions in the provisions of 40 C.F.R. § 60.48b(g)(2) must submit to the Administrator for approval a plan, known as a predictive emissions monitoring system ("PEMS") plan, that identifies the operating conditions to be monitored and the records to be maintained. This plan must be submitted to the Administrator for approval within 360 days of the initial startup of the affected facility.

141.     Under 40 C.F.R. § 60.49b(h), the owner or operator of any affected facility subject to the NOx standard is required to submit excess emission reports for any excess emissions that occurred during the reporting period.

142.     Under 40 C.F.R. § 60.49b(w), the reporting period for the reports required under NSPS Subpart Db is each six month period. All reports must be submitted to the Administrator and must be postmarked by the 30th day following the end of the reporting period.

**D.     Title V of the CAA**

143.     Title V of the CAA, 42 U.S.C. §§ 7661-7661f, establishes a federal operating permit program for certain air pollution sources, including "major sources."  The purpose of Title V is to ensure that all "applicable requirements" for compliance with the CAA are collected in one document. *See* 42 U.S.C. § 7661c(a).

144.     "Major source" under Title V includes, *inter alia*, any stationary source that is a "major source" as defined in Section 112 of the CAA, 42 U.S.C. § 7412. Section 112 of the CAA, 42 U.S.C. § 7412, defines a "major source" as any stationary source or group of stationary

sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.

145.    Pursuant to Section 502(b) of the CAA, 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. 57 Fed. Reg. 32250 (July 21, 1992). These regulations are codified at 40 C.F.R. Part 70.

1.    Louisiana's Title V Operating Permit Program

146.    At all times relevant to this Complaint, the regulations of Louisiana's Operating Permit Program were codified at LAC 33:III.Chapter 5 and closely mirror the Federal Title V regulations codified at 40 C.F.R. Part 70.

147.    Of relevance to this Complaint, LDEQ also implements notification and other regulations found at LAC 33:I.  At all times relevant to this complaint, Firestone has been required to comply with LAC 33:I regulations as specific requirements ("SR") in a Title V Federal Operating Permit.

148.    Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), the implementing regulations, and the Louisiana Title V Operating Permit Program provide that no source subject to Title V, including a "major source," may operate except in compliance with a Title V federal operating permit. 40 C.F.R. §§ 70.1(b) and 70.7(b); LAC 33:III.501.C and 507.A and B.

149.    Section 501 of the CAA, 42 U.S.C. § 7661, the implementing regulations, and the Louisiana Title V Operating Permit Program define a "major source" as, *inter alia*, a "major source" as defined in Section 112 of the CAA, 42 U.S.C. § 7412. 40 C.F.R. § 70.2; LAC 33:III.501.C and 507.B.

150.     Section 112(a)(1) of the CAA, 42 U.S.C. § 7412(a)(1), the implementing regulation, and the Louisiana Title V Operating Permit Program define a "major source" as any stationary source that emits or has the potential to emit, in the aggregate, 10 tpy or more of any HAP which has been listed pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, or 25 tpy or more of any combination of HAPs. LAC 33:III.502. Section 112(b)(1) of the CAA, 42 U.S.C. § 7412(b)(1), classifies n-hexane, 1,3- butadiene, and styrene as HAPs. 40 C.F.R. § 70.2; LAC. 33:III.502.

151.     Section 504(a) of the CAA, 42 U.S.C. § 7661c(a), the implementing regulations, and the Louisiana Title V Operating Permit Program require that each Title V permit include, *inter alia*, enforceable emission limitations, compliance schedules, and such other conditions as are necessary to assure compliance with "applicable requirements" of the CAA and the requirements of the relevant SIP. 40 C.F.R. § 70.6(a) and (c); LAC 33:III.501.C and 507.A.3.

152.      "Applicable requirements" are defined to include, *inter alia*, NESHAP, CAA 112(r), NSPS, and SIP requirements. 40 C.F.R. § 70.2; LAC 33:III.502.

153.     Of relevance to this Complaint, the Louisiana Title V Operating Permit Program assures compliance with "applicable requirements" by including in its federal operating permits, *inter alia*, emission limits, SRs, and general conditions at LAC 33:III.535 and 537.

154.     CAA Section 502(a), 42 U.S.C. § 7661a(a), the implementing regulations, and the Louisiana Operating Permit Program prohibit violations of any requirement of a Title V federal operating permit. 40 C.F.R. § 70.6(b)(1); LAC 33:III.501.C.4 and 507.B.2. Each term and condition in a Title V federal operating permit is federally enforceable unless specifically designated in the permit as not being federally enforceable. 40 C.F.R. § 70.6(b)(2); LAC 33:III.501.C.7 and 507.B.2.

31

155.    Under Louisiana's Title V Operating Permit Program, no construction, modification, or operation of a facility that ultimately may result in an initiation or increase in emissions may begin until a Title V permit has been approved and issued by LDEQ. LAC 33:III.501.C.2, 507.B.2, and 517.A. Any such permit issued must incorporate all federally applicable requirements. LAC 33:III.501.C, 507.A.3, and 507.B.2.

2.    Title V Federal Operating Permit Requirements

156.    Of relevance to this Complaint, a source operating under a Title V federal operating permit must comply with permit emission limits, permit SRs, Part 70 General Conditions at LAC 33:III.535, and Louisiana General Conditions at LAC 33:III.537.

i.   *Emission Limits*

157.    General Condition III of LAC 33:III.537.A states that emission rates for, *inter alia*, HAPs and other pollutants and the SRs of the permit that establish emission limitations are parts of the permit.

ii.  *Pollution Control*

158.    Louisiana General Condition I of LAC 33:III.537.A states, in part, that failure to install, properly operate, and/or maintain all proposed control measures and/or equipment as specified in the application and supplemental information shall be considered a violation of the permit.

iii. *Deviation Reporting Requirements*

159.    Pursuant to Part 70 General Condition K of LAC 33:III.535.A, a permittee must report, at least semiannually, all instances of deviations from permitted monitoring requirements.

160.    Pursuant to Part 70 General Condition R of LAC 33:III.535.A, a permit holder must submit prompt reports of all permit deviations as specified below to the Office of Environmental Compliance ("OEC").

    a.    A written report must be submitted within seven days of any emission in excess of permit requirements by an amount greater than the reportable quantity established for that pollutant in LAC 33:I Chapter 39.

    b.    A written report must be submitted for any emission in excess of permit emission limitations, regardless of the amount, where such emission occurs over a period of seven days or longer. The report shall be submitted no later than 14 days from the initial occurrence of the release event.

    c.    A written report must be submitted semiannually to address all permit deviations not included in paragraph 1 or 2 of Part 70 General Condition R. *See* 40 C.F.R. § 70.6(a)(3)(iii)(A).

161.    A permittee may report monitoring deviations, required by Part 70 General Condition K, in one deviation report, required by Part 70 General Condition R.

162.    Pursuant to 40 C.F.R. § 71.6 (a)(3)(iii)(C), as cited by the Louisiana Operating Permit Program instructions, "deviation" means any situation in which an emissions unit fails to meet a permit term or condition. The definition of deviation includes, *inter alia*, a situation in which an exceedance or excursion, as defined in 40 C.F.R. § 64.1, occurs. *See* Louisiana DEQ Title V Semiannual Monitoring Form.

163.    Pursuant to 40 C.F.R. § 64.1, as cited by the Louisiana Operating Permit Program instructions, "excursion" means a departure from an indicator range established for monitoring under 40 C.F.R. Part 64, consistent with any averaging period specified for averaging the results of the monitoring. *See* Louisiana DEQ Title V Semiannual Monitoring Form.

164.    Pursuant to 40 C.F.R. § 64.1, "monitoring" means any form of collecting data on a routine basis to determine or otherwise assess compliance with emission limitations or standards.

165.    Pursuant to Part 70 General Condition R of LAC 33:III.535.A, all deviation reports must be certified by a responsible official.

166.    Firestone's first semiannual period for the Facility runs from January 1 to June 30 of each year. Firestone must report all deviations occurring on January 1 through June 30 in its first Semiannual Title V Deviation Report.

167.    Firestone's second semiannual period for the Facility runs from July 1 to December 31 of each year. Firestone must report all deviations occurring on July 1 through December 31 in its second Semiannual Title V Deviation Report.

*iv.  Annual Compliance Certifications*

168.    Pursuant to Part 70 General Condition M of LAC 33:III.535.A, a permittee must submit annual compliance certifications to EPA as well as the permitting authority. *See also* 40 C.F.R. § 70.6(c)(5).

169.    Annual compliance reports are due by March 31 following the end of the reporting year.

*v.  Emergency Reporting Requirements*

170.    At all times relevant to this Complaint, Firestone's Federal Operating Permits have included specific requirements to comply with LAC 33:III.927.

171.    Pursuant to LAC 33:III.927, the unauthorized discharge of any air pollutant into the atmosphere must be reported in accordance with the provisions of LAC 33:I.Chapter 39. Pursuant to LAC 33:III.927, such reporting must include written reports pursuant to LAC 33:I:3925 that are submitted to LDEQ. "Timely and appropriate follow-up reports should be submitted detailing methods and procedures to be used to prevent similar atmospheric releases." LAC 33:III.927.A.

172.     An "unauthorized discharge" is a continuous, intermittent, or one-time discharge, whether intentional or unintentional, anticipated or unanticipated, from any permitted or unpermitted source which is in contravention of any provision of the LEQA or of any permit or license terms and conditions, or of any applicable regulation, compliance schedule, variance, or exception of the administrative authority. LAC 33:I.3905.

173.     Pursuant to LAC 33:I.3917, permit holders must promptly notify the Department of Public Safety (DPS) after learning of a discharge if the discharge exceeds a reportable quantity of a pollutant under LAC 33:I.Subchapter E.

174.     Pursuant to LAC 33:I.Subchapter E (referencing 40 C.F.R. § 302.4), 1,3-butadiene is an air pollutant with a reportable quantity. The reportable quantity for 1,3-butadiene is 10 pounds.

175.     Pursuant to LAC 33:I.3927, the basis for determination of the reportable quantity for any pollutant is that quantity of the substance discharged continuously, intermittently, or as a one-time mass discharge within any continuous 24-hour period.

176.     Pursuant to LAC 33:I.3917, permit holders may take up to 24 hours to notify DPS after learning of the discharge so long as the discharge does not cause an emergency condition.

**E.     Louisiana CAA SIP Requirements**

177.     The State of Louisiana has adopted a CAA SIP that has been approved by EPA. 40 C.F.R. Part 52, Subparts T.

178.     The Louisiana SIP regulations governing the control of air pollution by permits from a source, including a "major source," which emits or has the potential to emit any air contaminant are located in LAC 33:III.Chapter 5.

179.     Of relevance to this Complaint, LAC 33:III.5609.A (effective May 8, 1989) requires a person responsible for operation of a facility in the chemical and other industries to prepare standby plans for the reduction of emissions during periods of Air Pollution Alert, Air Pollution Warning, and Air Pollution Emergency.

180.     LAC 33:III.501.C.2 (effective September 6, 2016) requires the owner or operator of a "major source" to obtain an approved permit application, pay the appropriate permit fee, and obtain a permit issued by the permitting authority before the owner or operator constructs, modifies, or operates a facility that ultimately may result in an initiation of, or an increase in, emission of air contaminants.

181.     LAC 33:III.501.C.4 (effective September 6, 2016) requires the owner or operator of a "major source" to operate each source under a permit unless an exemption to the source applies or has been granted in accordance with LAC 33:III.Chapter 5.  The source must be operated in accordance with all terms and conditions of the permit. Noncompliance with any term or condition of the permit constitutes a violation of this Chapter and is grounds for enforcement action.

182.     LAC 33:III.501.C.7 (effective September 6, 2016) specifies that any terms and condition of the permit issued pursuant to the SIP or to LAC 33:III.507 are enforceable by EPA unless specifically designated in the permit as not being federally enforceable.

F.       **Louisiana Environmental Quality Act and Implementing Regulations**

183.     The LEQA, *inter alia*, includes statutory requirements for minerals, oil and gas operations, and environmental quality; authorizes LDEQ to provide and administer regulations to implement LEQA statutory requirements; and grants LDEQ the authority to enforce the LEQA and its implementing regulatory requirements.

36

184.    Pursuant to La. R.S. 30:2057(A)(1), no "person" may discharge air contaminants or noise pollution into the air of the State of Louisiana in violation of regulations of the secretary or the terms of any permit, license, or variance issued under the LEQA. A "person" is any individual, municipality, public or private corporation, partnership, firm, the United States Government, and any agent or subdivision thereof or any other juridical person, which shall include, but not be limited to, trusts, joint stock companies, associations, the state of Louisiana, political subdivisions of the state of Louisiana, commissions, and interstate bodies. La. R.S. 30:2004(8).

185.    Pursuant to La. R.S. 30:2057(A)(2), no "person" may violate any rule or regulation adopted under the LEQA.

186.    Of relevance to this Complaint, in addition to the Title V regulations and requirements discussed in Paragraphs 143-176 and SIP regulations and requirements discussed in Paragraphs 177-182, Louisiana implements the following LAC regulations.

    *i.   Emission Standards*

187.    Pursuant to LAC 33:III.905, "…air pollution control facilities should be installed whenever practically, economically, and technologically feasible. When facilities have been installed on a property, they shall be used and diligently maintained in proper working order whenever any emissions are being made which can be controlled by the facilities, even though the ambient air quality standards in affected areas are not exceeded."

188.    Pursuant to LAC 33:III.111.A, control equipment means any device or contrivance, operating procedure or abatement scheme used to prevent or reduce air pollution.

    *ii.  Housekeeping and Maintenance Practices Requirement*

189.   Pursuant to LAC 33:III.2113.A, best practical housekeeping and maintenance practices must be maintained at the highest possible standards to reduce the quantity of organic compounds emissions.

### iii.  Leak Detection and Repair Semiannual Reports

190.   Pursuant to LAC 33:III.2122.G, an owner or operator of a facility with an LDAR program must submit a LDAR report semiannually to the Office of Environmental Services ("OES"). The reports are due by the last day of the month (January and July) following the monitoring period or by an alternate date approved by the administrative authority.

### iv.  NESHAP

191.   Pursuant to LAC 33:III.Chapter 51, LDEQ implements the federal NESHAP program. The 40 C.F.R. Part 63 regulations as published in the *Code of Federal Regulations* on July 1, 2017 are incorporated by reference as they apply to "major sources" in the state of Louisiana. LAC 33:III.5122.A.

192.   Pursuant to LAC 33:III.5103.A, a "major source" is any stationary source of air pollutants that emits, or has the potential to emit, in the aggregate, 10 tons per year or more of any toxic air pollutant listed in LAC 33:III.5112, Table 51.1 or 25 tons per year or more of any combination of toxic air pollutants listed in LAC 33:III.5112, Table 51.1.  A "stationary source" is any building, structure, facility, or installation that emits or may emit any toxic air pollutant designated by this Subchapter. *Id*.

### v.  NSPS

193.   Pursuant to LAC 33:III.Chapter 30, LDEQ implements the federal NSPS program. The 40 C.F.R. Part 60 regulations as published in the *Code of Federal Regulations* at 40 CFR 60, July 1, 2017 are incorporated by reference. LAC 33:III.3003.A.

### vi. *Chemical Accident Prevention and Minimization of Consequences*

194.     Pursuant to LAC 33:III.Chapter 59, LDEQ implements a state chemical accident prevention program ("CAPP"). The CAPP regulations incorporate by reference 40 C.F.R. Part 68, with certain modifications and exceptions.

## G.     **Enforcement of the CAA**

195.     Section 113(a)(1) of the CAA, 42 U.S.C. § 7413(a)(1), authorizes EPA to bring a civil action if the Administrator finds that any person is in violation of any requirement or prohibition of an applicable SIP or permit.

196.     Section 113(a)(3) of the CAA, 42 U.S.C. § 7413(a)(3), authorizes EPA to bring a civil action if the Administrator finds that any person is in violation of, *inter alia*, any regulation promulgated or permit promulgated, issued, or approved under Sections 111 and 112 of the CAA, 42 U.S.C. §§ 7411 and 7412, or any regulation promulgated or permit promulgated, issued, or approved under Title V of the CAA, 42 U.SC. §§ 7661-7661f.

197.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes EPA to initiate a judicial enforcement action for a permanent or temporary injunction to address CAA violations, as well as to seek civil penalties of up to $25,000 per day for each violation. The Debt Collection Improvement Act, 31 U.S.C. § 3701 *et seq*., requires EPA to periodically adjust its civil penalties for inflation. On December 11, 2008, January 12, 2017, February 6, 2019, January 13, 2020, and December 23, 2020, EPA adopted and revised regulations entitled "Adjustment of Civil Monetary Penalties for Inflation," 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under the CAA. EPA is authorized to seek civil penalties of up to $37,500 per day for each violation that occurs between January 13, 2009 and December 6, 2013; up to $37,500 per day for each violation that occurs between December 7, 2013 and November 2, 2015 or assessed

before August 1, 2016; and up to $102,638 per day for each violation that occurs after November 2, 2015 where penalties are assessed on or after December 23, 2020. 40 C.F.R. § 19.4; 73 Fed. Reg. 75,340 (December 11, 2008); 82 Fed. Reg. 3,633 (January 12, 2017); 84 Fed. Reg. 2056 (February 6, 2019); 85 Fed. Reg. 1751 (January 13, 2020); 85 Fed. Reg. 83820 (December 23, 2020).

198.    La. R.S. 30:2025(E)(1)(a) authorizes civil penalties "of not more than the cost to the state of any response action made necessary by such violation which is not voluntarily paid by the violator, and a penalty of not more than [$32,500] for each day of violation. However, when any such violation is done intentionally, willfully, or knowingly, or results in a discharge or disposal which causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health, such person may be liable for an additional penalty of not more than [$1,000,000]." Pursuant to La. R.S. 30:2025, LDEQ is entitled to injunctive relief without the requisite showing of irreparable injury when the conduct sought to be restrained is unconstitutional or unlawful, *i.e.*, when the conduct sought to be enjoined constitutes a direct violation of a prohibitory law and/or a violation of a constitutional right. Jurisich v. Jenkins, 749 So. 2d 597 (La. 1999).

## II.    EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT AND POLLUTION PREVENTION ACT

199.    EPCRA was enacted on October 17, 1986, as Title III of the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 (1986) (codified at 42 U.S.C. §§ 11001-11050).

200.    The purpose of EPCRA is to provide communities with information on potential chemical hazards within their boundaries and to foster state and local emergency planning efforts

40

to control any accidental releases. Emergency Planning and Community Right-to-Know Programs, Interim Final Rule, 51 Fed. Reg. 41,570 (1986).

201.    To achieve this end, EPCRA mandates that state emergency response commissions ("SERC") and local emergency planning committees ("LEPC") be created. 42 U.S.C. § 11001(a) and (c).  EPCRA establishes a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of a health-threatening release. 42 U.S.C. § 11001.  EPCRA further mandates that industrial and commercial facilities, at which a hazardous chemical is produced, used, or stored, notify SERCs and LEPCs when they have releases of extremely hazardous substances and hazardous substances. 42 U.S.C. § 11004.

**A.    EPCRA 304: Notification Requirements**

202.    Pursuant to Section 304 of EPCRA, 42 U.S.C. § 11004, and 40 C.F.R. Part 355, the owner or operator of a facility must notify the community emergency coordinator for the LEPC and the SERC of any State likely to be affected by the release if (1) the owner or operator produces, uses or stores a hazardous chemical, as defined under 29 C.F.R. § 1910.1200(c), at the facility and (2) the owner or operator releases a reportable quantity of any extremely hazardous substance or a hazardous substance as defined by CERCLA within a 24-hour period.

203.    Pursuant to 40 C.F.R. §§ 355.33 and 355.40, the owner or operator of a facility shall immediately notify the LEPC and the SERC of a reportable quantity release and, as soon as practicable, submit a written follow-up emergency notification.

204.    Section 329(4) of EPCRA, 42 U.S.C. § 11049(4), and 40 C.F.R. § 355.20 define "facility" to mean, in relevant part, all buildings, equipment, structures, and other stationary items which are located on a single site and that are owned or operated by the same person.

205.     Pursuant to 29 C.F.R. § 1910.1200(c), 1,3-butadiene, n-hexane, and styrene are hazardous chemicals.

206.     Pursuant to 40 C.F.R. §§ 355.30 and 302.4, 1,3-butadiene is a hazardous substance under CERCLA and therefore a hazardous substance under the EPCRA 304.

207.     Pursuant to 40 C.F.R. § 302.4, Table 302.4, 1,3-butadiene has a reportable quantity of 10 pounds.

208.     At all times relevant to this Complaint, the Louisiana Emergency Response Commission was the SERC for Louisiana, under Section 301(a) of EPCRA, 42 U.S.C. § 11001(a).

209.     At all times relevant to this Complaint, the Calcasieu Parish Local Emergency Planning Committee was the LEPC for an area likely to be affected by a release from the Facility, under Section 301(c) of EPCRA, 42 U.S.C. § 11001(c).

**B.      EPCRA 313 AND PPA 6607: Reporting Requirements**

210.     Pursuant to Section 313 of EPCRA, 42 U.S.C. § 11023, an owner or operator of a facility is required to complete and submit a toxic chemical release form (Form R) to the Administrator of EPA and to the State in which the subject facility is located by July 1, for each toxic chemical known by the owner or operator to be manufactured, processed, or otherwise used in amounts exceeding the established threshold amount during that preceding calendar year if the facility:

    a.  Has 10 or more full-time employees;

    b.  Is an establishment with a primary Standard Industrial Classification ("SIC") major group or industry code listed in 40 C.F.R. § 372.23(a), or a primary North American Industry Classification System ("NAICS") subsector or industry code listed in 40 C.F.R. §§ 372.23(b) or (c); and

42

    c.   Manufactured, processed, or otherwise used a toxic chemical listed under Section 313(c) of EPCRA and 40 C.F.R. § 372.65, in excess of the threshold amounts established under Section 313(f) of EPCRA, 42 U.S.C. § 11023(f), and 40 C.F.R. §§ 372.25, 372.27, or 372.28 during the preceding calendar year.

211.    Pursuant to Section 313(g)(2) of EPCRA, 42 U.S.C. § 11023(g)(2) , in order to provide the information required under this section, the owner or operator of a facility may use readily available data (including monitoring data) collected pursuant to other provisions of law, or, where such data are not readily available, reasonable estimates of the amounts involved.

212.    Pursuant to 40 C.F.R. § 372.65, n-hexane is a toxic chemical.

213.    Pursuant to 40 C.F.R. § 372.25(b) the threshold quantity for a toxic chemical "otherwise used" at the facility is 10,000 pounds.

214.    Under 40 C.F.R. § 372.27, the owner or operator may apply an alternate threshold of 1 million pounds per year to a toxic chemical.  The owner or operator may apply an alternate threshold to a toxic chemical if the facility would have an annual reportable amount of that toxic chemical not exceeding 500 pounds for the combined total quantities: released at the facility; disposed within the facility; recovered at the facility as a result of recycle operations; combusted for the purpose of energy recovery at the facility; and amounts transferred from the facility to off-site locations for the purpose of recycle, energy recovery, treatment, and/or disposal.

215.    Pursuant to 40 C.F.R. § 372.85 (b)(2), by signing the Form R, the senior management official for the facility certifies that the submitted information is true and complete, and that amounts and values in the report are accurate based upon reasonable estimates using data available to the preparer of the report.

216.     Pursuant to Section 6607 of the PPA, 42 U.S.C. § 13106, a facility that is required to file a Form R for any toxic chemical must include with each such annual filing a toxic chemical source reduction and recycling report.

217.     Pursuant to 42 U.S.C. § 13106(b)(2), the owner or operator must include, in the toxic chemical source reduction and recycling report, the amount of the chemical from the facility that is recycled (at the facility or elsewhere) during such calendar year, the percentage change from the previous year, and the process of recycling used.

**C.     Enforcement of EPCRA 304**

218.     Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), provides that any person who violates the notice requirements of Section 304 of EPCRA, 42 U.S.C. § 11004, shall be liable to the United States for civil penalties.

219.     Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), authorizes EPA to assess a civil penalty of up to $25,000 per day of violation, and in the case of a second or subsequent violation $75,000 per day of violation of EPCRA Section 304, 42 U.S.C. § 11004.  The Debt Collection Improvement Act, 31 U.S.C. § 3701 *et seq*., requires EPA to periodically adjust its civil penalties for inflation.  On December 11, 2008, January 12, 2017, February 6, 2019, January 13, 2020, and December 23, 2020, EPA adopted and revised regulations entitled "Adjustment of Civil Monetary Penalties for Inflation," 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under EPCRA.  For each violation that occurs between January 13, 2009 and December 6, 2013, penalties of up to $37,500 per day may be assessed; for each violation that occurs between December 7, 2013 and November 2, 2015 or assessed before August 1, 2016, penalties of up to 37,500 per day may be assessed; and for each violation that occurs after November 2, 2015 where penalties are assessed on or after December 23, 2020, penalties of up

44

to $59,017 per day may be assessed.  Additionally, in the case of a second or subsequent

violation, for each violation that occurs between January 13, 2009 and December 6, 2013,

penalties of up to $107,500 per day may be assessed; for each violation that occurs between

December 7, 2013 and November 2, 2015 or assessed before August 1, 2016, penalties of up to

$117,500 per day may be assessed; for each violation that occurs after November 2, 2015 where

penalties are assessed on or after January 13, 2020 but before December 23, 2020, penalties of

up to $174,985 per day may be assessed; and for each violation that occurs after November 2,

2015 where penalties are assessed on or after December 23, 2020, penalties of up to $177,053

per day may be assessed.  40 C.F.R. § 19.4; 73 Fed. Reg. 75,340 (December 11, 2008); 82 Fed.

Reg. 3633 (January 12, 2017); 84 Fed. Reg. 2056 (February 6, 2019); 85 Fed. Reg. 1751

(January 13, 2020); 85 Fed. Reg. 83820 (December 23, 2020).

### D.      **Enforcement of EPCRA 313 and PPA**

220.     Section 325(c)(1) of EPCRA, 42 U.S.C. § 11045(c)(1), provides that any person

who violates any requirement of Section 313 of EPCRA, 42 U.S.C. § 11023, shall be liable to the

United States for a civil penalty in an amount not to exceed $25,000 for each such violation. The

Debt Collection Improvement Act, 31 U.S.C. § 3701 *et seq*., requires EPA to periodically adjust

its civil penalties for inflation.  On December 11, 2008, January 12, 2017, February 6, 2019,

January 13, 2020, and December 23, 2020, EPA adopted and revised regulations entitled

"Adjustment of Civil Monetary Penalties for Inflation," 40 C.F.R. Part 19, to upwardly adjust the

maximum civil penalty under EPCRA.  For each violation that occurs between January 13, 2009

and December 6, 2013, penalties of up to $37,500 may be assessed; for each violation that occurs

between December 7, 2013 and November 2, 2015 or assessed before August 1, 2016, penalties

of up to $37,500 may be assessed; for each violation that occurs after November 2, 2015 where

penalties are assessed on or after January 13, 2020 but before December 23, 2020, penalties of up to $58,328 may be assessed; for each violation that occurs after November 2, 2015 where penalties are assessed on or after December 23, 2020, penalties of up to $59,017. 40 C.F.R. § 19.4; 73 Fed. Reg. 75,340 (December 11, 2008); 82 Fed. Reg. 3,633 (January 12, 2017); 84 Fed. Reg. 2056 (February 6, 2019); 85 Fed. Reg. 1751 (January 13, 2020); 85 Fed. Reg. 83820 (December 23, 2020).  Section 6607(c) of the PPA, 42 U.S.C. § 13106(c), provides that Section 325(c) of EPCRA, 42 U.S.C. § 11045(c), applies to the reporting requirements of Section 6607 of the PPA in the same manner as to the reports required under section 313 of EPCRA.

221.    Section 325(c)(4) of EPCRA, 42 U.S.C. § 11045(c)(4), authorizes EPA to assess a civil penalty by administrative order or bring an action to assess and collect the penalty in the United States district court.

## III.    COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT

222.    Section 102(a) of CERCLA, 42 U.S.C. § 9602(a), requires the Administrator of EPA to publish a list of substances designated as hazardous substances which when released into the environment may present substantial danger to public health or welfare or the environment, and to promulgate regulations establishing that quantity of any hazardous substance, the release of which shall be required to be reported under Section 103(a) of CERCLA, 42 U.S.C. § 9603(a). The list of reportable quantities of hazardous substances is codified at 40 C.F.R. Part 302.

### A.    Reporting Requirements

223.    Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), as implemented by 40 C.F.R. Part 302, requires, in relevant part, a person in charge of an onshore facility, as soon as he/she has knowledge of a release (other than a federally permitted release) of a hazardous substance from such facility in quantities equal to or greater than the reportable quantity in a 24-hour

period to immediately notify the National Response Center ("NRC") established under the Section 311(d)(2)(E) of the CWA, 33 U.S.C. § 1321(d)(2)(E), of such release.

224.    Pursuant to Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), and 40 C.F.R. § 302.3, a "person" is an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body.

225.    "Onshore facility," under Section 101(18) of CERCLA, 42 U.S.C. § 9601, and 40 C.F.R. § 302.3, is defined as any facility of any kind located in, on, or under, any land or non-navigable waters within the United States.  42 U.S.C. § 9601(18).

226.    Pursuant to 40 C.F.R. § 302.4, 1,3-Butadiene is a hazardous substance.

227.    Pursuant to 40 C.F.R. § 302.4, Table 302.4, 1,3-butadiene has a reportable quantity of ten (10) pounds.

**B.      Enforcement of CERCLA**

228.    Section 109(c)(1) of CERCLA, 42 U.S.C. § 9609(c)(1), provides that any person who violates the notice requirements of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), shall be liable to the United States for civil penalties.

229.    Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), authorizes EPA to assess a civil penalty of up to $25,000 per day of violation, and in the case of a second or subsequent violation, $75,000 per day of violation of CERCLA Section 103, 42 U.S.C. § 9603.  The Debt Collection Improvement Act, 31 U.S.C. § 3701 *et seq.*, requires EPA to periodically adjust its civil penalties for inflation.  On December 11, 2008, January 12, 2017, February 6, 2019, January 13, 2020, and December 23, 2020, EPA adopted and revised regulations entitled "Adjustment of Civil Monetary Penalties for Inflation," 40 C.F.R. Part 19, to upwardly adjust the maximum civil

penalty under CERCLA.  For each violation that occurs between January 13, 2009 and December 6, 2013, penalties of up to $37,500 per day may be assessed; for each violation that occurs between December 7, 2013 and November 2, 2015 or assessed before August 1, 2016, penalties of up to $37,500 per day may be assessed; for each violation that occurs after November 2, 2015 where penalties are assessed on or after January 13, 2020 but before December 23, 2020, penalties of up to $58, 328 per day may be assessed; for each violation that occurs after November 2, 2015 where penalties are assessed on or after December 23, 2020, penalties of up to $59,017 per day may be assessed. Additionally, in the case of a second or subsequent violation, for each violation that occurs between January 13, 2009 and December 6, 2013, penalties of up to $107,500 per day may be assessed; for each violation that occurs between December 7, 2013 and November 2, 2015 or assessed before August 1, 2016, penalties $117,500 may be assessed; for each violation that occurs after November 2, 2015 where penalties are assessed on or after January 13, 2020 but before December 23, 2020, penalties of up to $174,985 per day may be assessed; and for each violation that occurs after November 2, 2015 where penalties are assessed on or after December 23, 2020, penalties of up to $177,053 per day may be assessed.  40 C.F.R. § 19.4; *see* 73 Fed. Reg. 75,340 (December 11, 2008); 82 Fed. Reg. 3,633 (January 12, 2017); 84 Fed. Reg. 2056 (February 6, 2019); 85 Fed. Reg. 1751 (January 13, 2020); 85 Fed. Reg. 83820 (December 23, 2020).

## GENERAL ALLEGATIONS

230.    The National Enforcement Investigations Center ("NEIC") conducted an on-site inspection at the Facility from April 19, 2016 through April 27, 2016 (the "Inspection").

## I.    CAA

231.    At all times relevant to this Complaint, Firestone has been the "owner or operator," as defined in Section 112(a)(9) of the CAA, 42 U.S.C. § 7412(a)(9), of the Facility.

232.    At all times relevant to this Complaint, the Facility has been a "source," a "stationary source," and a "major source" within the meaning of the CAA and implementing federal and state regulations.

## A.  NESHAPs

### 1.    NESHAP Subpart U

233.    At all times relevant to this Complaint, Firestone has owned and operated one EPPU at the Facility, within the meaning of NESHAP Subpart U. 40 C.F.R. § 63.482; 40 C.F.R. § 63.482.

234.    At all times relevant to this Complaint, the EPPU is an existing affected source, built before June 12, 1995, that is subject to NESHAP Subpart U. The affected source includes, *inter alia*, dryers, heat exchange systems, and flares. 40 C.F.R. § 63.480.

235.    At all times relevant to this Complaint, Firestone has been required to limit all residual HAPs from back-end processes to a monthly weighted average of 10 kg total organic HAP per Mg crumb rubber (dry weight).

236.    Based upon information and belief, at all times relevant to this Complaint, the Facility's strippers have operated in continuous mode.

237.    At all times relevant to this Complaint, Firestone has been required to demonstrate compliance with residual organic HAP limitations by taking at least one representative sample of rubber polymer each operating day. 40 C.F.R. § 63.495(a).

238.    At all times relevant to this Complaint, a number of storage vessels including storage vessel F-148 have been a Group 1 storage vessel as defined at 40 C.F.R. § 63.111,

assigned to the Facility's EPPU in accordance with 40 C.F.R. § 63.480(g), and as a result subject to 40 C.F.R. Part 63, Subpart U and required to operate and maintain the storage vessel according to NESHAP Subpart G. 40 C.F.R. § 63.480(g); 40 C.F.R. § 63.484.

### 2.    NESHAP Subpart EEEE

239.    At all times relevant to this Complaint, Firestone has owned and operated an OLD operation, whereby Firestone loaded recycle butadiene and styrene using transfer racks at the Facility. 40 C.F.R. § 63.2406.

240.    At all times relevant to this Complaint, the Facility has been a "major source" under NESHAP Subpart EEEE. 40 C.F.R. § 63.2406.

241.    At all times relevant to this Complaint, the Facility's OLD operation has been an "existing affected source" subject to NESHAP Subpart EEEE. 40 C.F.R. § 63.2338.

242.    At all times relevant to this Complaint, Firestone was required to conduct initial compliance demonstrations as specified in Tables 6 and 7 to Subpart EEEE and was required to submit a Notification of Compliance Status under Subpart EEEE.

### 3.    NESHAP Subpart ZZZZ

243.    At all times relevant to this Complaint, Firestone has owned and operated at least two stationary RICE, Stormwater Effluent Pump PE-10, and Effluent Emergency Generator PE-11. 40 C.F.R. § 63.6585(a).

244.    At all times relevant to this Complaint, the Facility has been a "major source of HAP emissions" under NESHAP Subpart ZZZZ. 40 C.F.R. § 63.6585(b).

245.    At all times relevant to this Complaint, the pump-engine and emergency engine have been "affected sources" subject to NESHAP Subpart ZZZZ. 40 C.F.R. § 63.6590.

### 4.    NESHAP Subpart DDDDD

246.     At all times relevant to this Complaint, Firestone has owned and operated the following industrial boilers: Boiler No. 8 (EQT 0009) ("Boiler No. 8"); B-100, Natural Gas Boiler (EQT 0054) ("Boiler B-100"); and B-900, Natural Gas Boiler (EQT 0052) ("Boiler B-900). 40 C.F.R. § 63.7485.

247.     At all times relevant to this Complaint, Boiler No. 8, Boiler B-100, and Boiler B-900 have been "affected sources" subject to NESHAP Subpart DDDDD. 40 C.F.R. § 63.7490.

### B.     Chemical Accident Prevention (CAA 112(r)(7))

248.     At all times relevant to this Complaint, the Facility has been a "stationary source" because it is a group of buildings, structures, and equipment from which an accidental release of a regulated substance such as 1,3-butadiene, or boron trifluoride may occur. 40 C.F.R. § 68.3.

249.     At all times relevant to this Complaint, the Facility has had more than a threshold quantity of 1,3-butadiene and boron trifluoride, separately, in a process. 40 C.F.R. § 68.130.

250.     At all times relevant to this Complaint, the Facility has not been eligible for Program 1 requirements because, for example, when conducting a worst-case release assessment for boron trifluoride, Firestone found that the distance from the Facility to a toxic endpoint is 6.8 miles, which is greater than the 2-mile distance from the Facility to the closest residential area. 40 C.F.R. § 68.10(f)(2).

251.     At all times relevant to this Complaint, the Facility has been required to comply with Program 3 requirements because (1) the Facility has not been eligible for Program 1 requirements and (2) the Facility's synthetic rubber manufacturing process has been subject to the OSHA process safety management standard, 29 C.F.R. 1910.119. 40 C.F.R. § 68.10(h).

252.     At all times relevant to this Complaint, 40 C.F.R. Part 68 has been applicable to Firestone and its Facility.

C.    **NSPS Subpart Db**

253.    At all times relevant to this Complaint, based upon information and belief, the B-100 and B-900 boilers are "new sources," as defined in 42 U.S.C. § 7411(a)(2), because they were constructed after NSPS Subpart Db was published on June 19, 1984. 42 U.S.C. § 7411(a)(2); 40 C.F.R. § 60.40b(a).

254.    At all times relevant to this Complaint, based upon information and belief, the Boiler B-100 and Boiler B-900 have been "affected facilities" because they are steam generating units that were constructed after June 19, 1984 and have a heat input capacity from fuels combusted in the steam generating unit of greater than 29 megawatts (MW) (100 MMBTU/hr)). 40 C.F.R. § 60.40b(a).

255.    At all times relevant to this Complaint, Boiler B-100, and Boiler B-900 have been subject to NSPS Subpart Db.

D.    **Title V of the CAA**

256.    At all times relevant to this Complaint;

   a.    the Facility has been a "stationary source" because it emits or may emit pollutants such as n-hexane and styrene, (LAC 33:III.502, 42 U.S.C. § 7412(b)(1)); and

   b.    The Facility has been a "major source" because it emits or has the potential to emit 10 tons per year or more of n-hexane or styrene, which are HAPs, and 25 tons per year or more of any combination of n-hexane and styrene (LAC 33:III.502; 42 U.S.C. § 7412(b)(1)).

257.    At all times relevant to this Complaint, Title V of the CAA has applied to Firestone and its Facility, including LAC 33:III.501.C.2 and 4 and LAC 33:III.507.B.2.

258.    At all times relevant to this Complaint, Firestone has been subject to a federally enforceable Title V Federal Operating Permit.

259.     Firestone obtained, was operating under, and was responsible for complying with the following permits:

    a.   Permit 0520-00007-V1AA ("V1AA Federal Operating Permit" or "V1AA Permit") from May 23, 2006 to March 22, 2010;

    b.   Permit 0520-00007-V2 ("V2 Federal Operating Permit" or "V2 Permit") from March 23, 2010 to January 26, 2012;

    c.   Permit 0520-00007-V3 ("V3 Federal Operating Permit" or "V3 Permit") from January 27, 2012 to July 8, 2015;

    d.   Permit 0520-00007-V4 ("V4 Federal Operating Permit" or "V4 Permit") from July 9, 2015 to November 9, 2016;

    e.   Permit 0520-00007-V5 ("V5 Federal Operating Permit" or "V5 Permit") from November 10, 2016 to June 29, 2017; and

    f.   Permit 0520-00007-V6 ("V6 Federal Operating Permit" or "V6 Permit") from June 30, 2017 to March 8, 2018.

260.     At all times relevant to this Complaint, Firestone's federal operating permits required the company to submit semiannual Title V monitoring and deviation reports to OEC that include all instances of deviations from permitted monitoring and other permitted requirements. Part 70 General Conditions K and R of LAC 33:III.535.A; see also 40 C.F.R. § 70.6(a)(3)(iii)(A).

261.     Firestone reports all monitoring and other deviations in its first and second Semiannual Title V Deviation Reports and Title V Annual Compliance Certification Reports.

## E.     CAA SIP Permitting Requirement

262.     At all times relevant to this Complaint, the Facility was a "major source" as defined in LAC 33:III.502 because it emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of n-hexane or styrene and 25 tons per year or more of any combination of n-hexane and styrene. LAC 33:III.502.

263.    Since September 6, 2016, Firestone and its Facility have been subject to LAC 33:III.501 as part of the Louisiana SIP.

264.    At all times relevant to this Complaint, Firestone and its Facility have been subject to LAC 33:III.5609.A as part of the Louisiana SIP.

### F.    LEQA

265.    At all times relevant to this Complaint, Firestone has been a "person" and "owner and operator" within the meaning of LEQA and implementing regulations.

266.    At all times relevant to this Complaint, the Facility has been a "source," a "stationary source," and a "major source" within the meaning of the LEQA and implementing regulations.

267.    At all times relevant to this Complaint, Firestone and its Facility have been subject to LEQA and implementing regulations, particularly at LAC 33:I and LAC 33:III.

268.    At all times relevant to this Complaint, Firestone and its Facility have been required to comply with LDEQ's CAPP regulations, found at LAC 33:III.Chapter 59.

## II.    EPCRA AND PPA

### A.    EPCRA 304

269.    At all times relevant to this Complaint, the Facility has been a "facility." 42 U.S.C. § 11049(4); 40 C.F.R. § 355.61.

270.    At all times relevant to this Complaint, Firestone was the "owner or operator." 42 U.S.C. § 1104.

271.    At all times relevant to this Complaint, Firestone has produced, used, or stored hazardous chemicals such as 1,3-butadiene at the Facility. 40 C.F.R. §§ 355.30 and 302.4.

272.     At all times relevant to this Complaint, the reportable quantity for 1,3-butadiene, a hazardous substance, is 10 pounds. 40 C.F.R. §§ 355.33 and 302.4.

273.     At all times relevant to this Complaint, Section 304 of EPCRA has been applicable to Firestone and its Facility.

### B.     EPCRA 313 & PPA

274.     At all times relevant to this Complaint, the Facility has been a "facility" because it consists of buildings, equipment and structures which are located on a single site and which are owned by the same person. 42 U.S.C. § 11049(4).

275.     At all times relevant to this Complaint, Firestone has employed more than 10 full-time employees and currently employs approximately 300 employees at the Facility. 42 U.S.C. § 11023.

276.     At all times relevant to this Complaint, the Facility's primary NAICS industry code has been 325212 (Synthetic Rubber Manufacturing) and subsector code has been 325 (Chemical Manufacturing). 40 C.F.R. § 372.23(b).

277.     At all times relevant to the Complaint, Firestone has otherwise used n-hexane, a toxic chemical, in amounts exceeding the threshold quantity of 10,000 pounds. 40 C.F.R. § 372.65; 40 C.F.R. § 372.25(b).

278.     At all times relevant to this Complaint, Firestone could not apply an alternate threshold of 1 million pounds per year for n-hexane because the Facility's annual reportable amount of n-hexane exceeded 500 pounds.

279.     At all times relevant to this Complaint, Section 313 of EPCRA, 42 U.S.C. § 11023, has been applicable to Firestone and its Facility.

280.     At all times relevant to this Complaint, Section 6607 of the PPA, 42 U.S.C.

§ 13106, has been applicable to Firestone and its Facility.

## III.   CERCLA

281.     At all times relevant to this Complaint, the Facility has been an "onshore facility"

because it is a facility located on land within Sulphur, Louisiana. 42 U.S.C. § 9601(9), and 40

C.F.R. § 302.3.

282.     At all times relevant to this civil complaint, Firestone was "in charge of" the

Facility as that phrase is used in Section 103 of CERCLA, 42 U.S.C. § 9603(a).

283.     At all times relevant to the Complaint, 1,3-Butadiene has been a hazardous

substance with a reportable quantity of 10 pounds. 40 C.F.R. § 302.4.

284.     At all times relevant to the Complaint, Section 103 of CERCLA, 42 U.S.C.

§ 9603, has been applicable to Firestone and its Facility.

### CLEAN AIR ACT CLAIMS

### *NESHAP Subpart U*

### FIRST CLAIM FOR RELIEF

### Failure to Comply with Heat Exchange System Requirements

Subclaim 1A: Failure to Detect Leaks from Heat Exchange Systems
(40 C.F.R. § 63.104(b)(6), Federal Operating Permits,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

285.     Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-176, 183-

198, 230-247, 256-261, and 265-268 as if fully set forth herein.

286.     Pursuant to 40 C.F.R. § 63.104(b)(6) (as referenced by 40 C.F.R. § 63.502(n)) and

its V3-V4 Federal Operating Permits, Firestone was required to identify a leak from a Heat

Exchange System when the exit mean concentration was found to be greater than the entrance

mean using a one-sided statistical procedure at the 0.05 level of significance and the amount by which it was greater was at least 1 part per million or 10 percent of the entrance mean, whichever was greater.

287.    Based upon information obtained during the 2016 NEIC Inspection, Firestone transposed the inlet and outlet data in the Facility's Leak Determination Spreadsheet on numerous occasions from 2013-2016.

288.    As a result of Firestone's miscalculations of sampling results from the Facility's Heat Exchange System, it failed to identify at least two leaks in the Heat Exchange Systems from the North Cooling Tower on December 23, 2013 and November 5, 2014 and one leak from the South Cooling Tower on November 5, 2014.

289.    As a result of its failure to identify leaks from its Heat Exchange Systems on numerous occasions from 2013-2014, Firestone violated 40 C.F.R. § 63.104(b)(6) (as referenced by 40 C.F.R. § 63.502(n)), SR 234 of the V3 Federal Operating Permit, SR 269 of the V4 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

<u>Subclaim 1B: Failure to Timely Repair or Place on Delay of Repair</u>
(40 C.F.R. § 63.104(d)(1), Federal Operating Permits,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

290.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-176, 183-198, 230-247, 256-261, and 265-268 as if fully set forth herein.

291.    Pursuant to 40 C.F.R. § 63.104(d)(1) (as referenced by 40 C.F.R. § 63.502(n)) and its V3 Federal Operating Permit, Firestone was required to repair a leaking heat exchanger as soon as practical but not later than 45 calendar days after the owner or operator receives results of monitoring tests indicating a leak or place the Heat Exchange System on delay of repair if repair is technically infeasible and a shutdown is expected within the next two months.

292.    During the 2016 NEIC Inspection, NEIC Inspectors used the Facility's Heat Exchanger Testing Reports to determine that a leak occurred from the North Cooling Tower on November 18, 2013.

293.    According to Firestone's second 2013 Semiannual Title V Deviation Report, on November 21, 2013, Firestone took the exchanger out of service and attempted to repair the leak.

294.    On December 23, 2013, Firestone attempted to confirm the repair of the leak. Firestone stated that because the leak repair confirmation sample results were transposed when entered into the Leak Determination Spreadsheet, Firestone was unaware that the attempted repair was unsuccessful and that the leak was continuing.

295.    Firestone failed to repair the leak from the North Cooling Tower by January 31, 2014, which was seven calendar days after receiving sample results identifying a leak.

296.    As a result of its failure to repair the leak or place the Heat Exchange System on delay of repair by January 31, 2014, which was 45 calendar days after receiving sample results identifying a leak, Firestone violated 40 C.F.R. § 63.104(d)(1) (as referenced by 40 C.F.R. § 63.502(n)), SR 234 of the V3 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

<u>Subclaim 1C: Failure to Resample Seven (7) Days After Repair Attempt</u>
(40 C.F.R. § 63.104(d)(2), Federal Operating Permits,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

297.    Plaintiffs reallege and incorporate by reference Paragraphs  1-96, 143-176, 183-198, 230-247, 2567-261, and 265-268 as if fully set forth herein.

298.    Pursuant to 40 C.F.R. § 63.104(d)(2) (as referenced by 40 C.F.R. § 63.502(n)) and the V3-V4 Federal Operating Permits, Firestone was required to confirm that the Heat Exchange System has been repaired within seven calendar days of the repair or startup, whichever is later.

299.     During the 2016 NEIC Inspection, NEIC Inspectors used the Facility's Leak Determination Spreadsheet to determine that, on at least the following occasions from 2013-2015, Firestone failed to resample the Heat Exchange System cooling water within seven days of the repair attempts to the Facility's Heat Exchange System:

| Cooling Tower | Sampling Date | Date of Repair/Startup | Date of Resampling | Days until Resampling after repair | Days late |
|---------------|---------------|------------------------|--------------------|------------------------------------|-----------|
| North | 4/26/13 | 5/3/13 | 5/30/13 | 27 | 20 |
| North | 11/18/13 | 11/26/13 | 12/23/13 | 27 | 20 |
| South | 3/18/15 | 4/10/15 | 4/23/15 | 13 | 6 |
| South | 4/23/15 | 5/11/15 | 6/23/15 | 43 | 36 |
| South | 9/16/15 | 10/18/15 | 12/1/15 | 44 | 37 |

300.     As a result of its failure to resample within seven days of leak repair on numerous occasions, Firestone violated 40 C.F.R. § 63.104(d)(2) (as referenced by 40 C.F.R. § 63.502(n)), SR 234 of the V3 Federal Operating Permit, SR 269 of the V4 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

Subclaim 1D: 2016 Failure to Maintain Records
(40 C.F.R. § 63.506(b)(1), Federal Operating Permit,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

301.     Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-176, 183-198, 230-247, 256-261, and 265-268 as if fully set forth herein.

302.     Pursuant to 40 C.F.R. § 63.506(b)(1) and its V4 Federal Operating Permit, Firestone was required to maintain records of attempts to repair leaks of Facility heat exchangers.

303.     According to Firestone's 2016 Title V Deviation Report, Firestone failed to keep records of leak repair attempts to the heat exchangers for leaks occurring on April 1, April 6, and May 21, 2016.

304.    As a result of its failure to record leak repair attempts to the heat exchangers made at the Facility in 2016, Firestone violated 40 C.F.R. § 63.506(b)(1), SR 271 of the V4 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

Subclaim 1E: 2016 Improper Analysis Method Used for Heat Exchange System Samples
(40 C.F.R. § 63.104(b)(3), Federal Operating Permits,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

305.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-198, 230-247, and 256-268 as if fully set forth herein.

306.    According to Firestone's 2016 Annual Compliance Certification for the Facility, the analysis of the Facility's Heat Exchange Systems samples was performed using method SW8760B, which is not a Part 136 method as required 40 C.F.R. 63.104(b)(3) (as referenced by 40 C.F.R. § 63.502(n)).

307.    Firestone used method SW8760B as its heat exchanger sampling method from 2013 to November 22, 2016.

308.    As a result of its use of an unapproved sampling method for Facility heat exchangers from 2013-November 22, 2016, Firestone violated 40 C.F.R. § 63.104(b)(3) (as referenced by 40 C.F.R. § 63.502(n)), SR 234 of the V3 Federal Operating Permit, SR 269 of the V4 Federal Operating Permit, and SR 267 of the V5 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.2.

309.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for injunctive relief and civil penalties for Subclaims 1A through 1E, which occurred between 2013 and 2017. Pursuant to La. R.S. 30:2025, Firestone is liable to LDEQ for injunctive relief and civil penalties for Subclaims 1A through 1E.

## SECOND CLAIM FOR RELIEF

**Failure to Make Wastewater Stream Determinations, Include Information in Required NOCS and NESHAP Subpart U Reports, Monitor Equipment, and Submit Timely Reports**

Subclaim 2A: Failure to Identify Liquid Streams from Flare Knockout Drums
(40 C.F.R. § 63.132, Federal Operating Permits,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

310.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-198, 230-247, and 256-268 as if fully set forth herein.

311.    According to Firestone's first 2016 Semiannual Monitoring Report, in 2001 the Facility failed to identify the wastewater stream from knockout drum F-707, located at the Primary Flare.

312.    As a result of its failure to identify the wastewater stream, Firestone failed to sample and make the group determination of the stream, and thus violated 40 C.F.R. § 63.132 (as referenced by 40 C.F.R. § 63.501(a)), SR 75 of the V3 Federal Operating Permit, SR 72 of the V4 Federal Operating Permit, SR 72 of the V5 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

Subclaim 2B: Failure to Include Heat Exchangers Applicability in NOCS
(40 C.F.R. § 63.506(e)(5))

313.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 183-198, 230-247, and 265-268 as if fully set forth herein.

314.    Pursuant to 40 C.F.R. § 63.506(e)(5), Firestone was required to submit applicability determinations in a NOCS for Facility Heat Exchange Systems.

315.    According to the Federal Operating Permit 0520-00007-02 issued May 19, 1997, the Facility has used Heat Exchange Systems since before 2001.

316.    In November of 2001, Firestone submitted its initial NOCS for the Facility.

317.    Firestone's initial NOCS for the Facility failed to include Heat Exchange System applicability determinations.

318.    As a result of its failure to include Heat Exchange System applicability determinations in its initial NOCS for the Facility within the time required by NESHAP Subpart U, Firestone violated 40 C.F.R. § 63.506(e)(5).

319.    Firestone submitted a NOCS update to LDEQ dated September 13, 2019 that includes Heat Exchange System applicability determinations.

Subclaim 2C: Failure to Include Tanks in NOCS
(40 C.F.R. § 63.506(e)(5))

320.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 183-198, 230-247, and 265-268 as if fully set forth herein.

321.    According to the Facility's 2016 Annual Compliance Report and first 2017 Semiannual Title V Deviation Report, Firestone's initial NOCS for the Facility also failed to include all applicable tanks required by 40 C.F.R. § 63.506(e)(5).

322.    As a result of its failure to include all applicable tanks in its NOCS as required by NESHAP Subpart U from 2013 through June 2017, Firestone violated 40 C.F.R. § 63.506(e)(5).

Subclaim 2D: Violations Related to Bypasses
(40 C.F.R. § 172(j), Federal Operating Permits,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

323.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-198, 230-247, and 256-268 as if fully set forth herein.

324.    Pursuant to 40 C.F.R. § 172(j) (as referenced by 40 C.F.R. § 63.502) and its V4 Federal Operating Permit, Firestone was required to monitor the bypass lines of each closed-vent system by: operating a flow indicator that takes a reading at least once every 15 minutes, or by securing the bypass line valve in the non-diverting position with a car-seal or a lock-and-key

type configuration and visually inspecting the seal or closure mechanism at least once every month to ensure the valve is maintained in the non-diverting position and the vent stream is not diverted through the bypass line.

325.    According to Firestone's 2016 Annual Compliance Certification and 2017 Semiannual Title V Deviation Reports, Firestone failed to identify specific bypass lines of closed vent systems and, as a result, failed to monitor those bypass lines according to 40 C.F.R. § 172(j)(1) in 2016.

326.    As a result of its failure to monitor the bypass lines of each closed-vent system from 2013 through 2017, Firestone violated 40 C.F.R. § 172(j) (as referenced by 40 C.F.R. § 63.502), SR 209 of the V4 Federal Operating Permit, SR 207 of the V5 Federal Operating Permit, SR 225 of the V6 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

Subclaim 2E: Failure to Report Excursions in Subpart U Periodic Reports
(40 C.F.R. § 63.506(e)(6)(iii)(B), Federal Operating Permits,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

327.    Plaintiffs reallege and incorporate by reference Paragraphs  1-96, 143-176, 183-198, 230-247, 256-261, and 2656-268 as if fully set forth herein.

328.    Pursuant to 40 C.F.R. § 63.506(e)(6)(iii)(B) and its V3-V4 Federal Operating Permits, Firestone was required to report all excursions in its Subpart U Periodic Reports and include specific information such as start times and duration of excursions.

329.    Based on Firestone's Residual HAP Sampling Analysis, at least twelve (12) excursions occurred in each of the semiannual periods covered by the Second 2013 Subpart U Periodic Report (covering May 20, 2013 – November 19, 2013) through the First 2016 Subpart U Periodic Report (covering November 20, 2015 – May 19, 2016).

330.   Firestone failed to report any information about these 12 excursions.

331.   As a result of its failure to report multiple excursions in Subpart U Periodic Reports from 2013 to 2016, Firestone violated 40 C.F.R. § 63.506(e)(6)(iii)(B), SR 239 of the V3 Federal Operating Permit, SR 273 of the V4 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

Subclaim 2F:Failure to Report Leaks in Subpart U Periodic Reports
(40 C.F.R. § 63.506(e)(6), Federal Operating Permits,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

332.   Plaintiffs reallege and incorporate by reference Paragraphs  1-96, 143-176, 183-198, 230-247, 256-2612, and 2656-268 as if fully set forth herein.

333.   Pursuant to 40 C.F.R. § 63.506(e)(6), Firestone was required to submit Subpart U Periodic Reports that contained information specified in 40 C.F.R. § 63.182(d), which included leak information related to, for example, valves, pumps, compressors, and agitators.

334.   During the 2016 NEIC Inspection of the Facility, inspectors observed that there was no leak section or equipment leak information in the NESHAP Subpart U Reports with the following dates: September 30, 2013; January 17, 2014; July 17, 2014; January 16, 2015; January 18, 2016; and July 18, 2016.

335.   As a result of its failure to include equipment leak information in multiple NESHAP Subpart U Periodic Reports, Firestone violated 40 C.F.R. § 63.506(e)(6), SR 239 of the V3 Federal Operating Permit, SR 273 of the V4 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

336.   Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for injunctive relief and civil penalties for Subclaims 2A through 2F, which

occurred between 2013 and 2016. Pursuant to La. R.S. 30:2025, Firestone is also liable to LDEQ for injunctive relief and civil penalties for Subclaims 2A and 2B.

### THIRD CLAIM FOR RELIEF

### Failure to Properly Sample and Limit Sampling Excursions of Rubber Polymer

Subclaim 3A: 2013-2017 Failure to Sample Dryer Crumb Rubber
for All Residual Organic HAPs
(63.494(a)(2)(i), Federal Operating Permits, LAC 33:III.501.C.4, LAC 33:III.507.B.2)

337.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-198, 230-247, and 256-268 as if fully set forth herein.

338.    Pursuant to 40 C.F.R. § 63.494(a)(2)(i) and its V3-V6 Operating Permits, the residual organic HAPs from dryer crumb rubber samples could not exceed a monthly weighted average of 10 kg total organic HAP per Mg crumb rubber (dry weight).

339.    Firestone's January 25, 2018 letter to LDEQ regarding Dryer Cap excess emissions confirmed that Firestone analyzed dryer crumb rubber samples for n-hexane to determine the Facility's monthly weighted average residual HAP emissions.

340.    Firestone reported in its January 25, 2018 letter to LDEQ regarding Dryer Cap excess emissions that its 2017 Dryer Emissions Study revealed emissions of n-hexane, 1,3-butadiene, and styrene.

341.    Based on Firestone's reporting, from 2013 to May 13, 2017, Firestone did not sample the Facility's dryer crumb rubber for the presence of 1,3-butadiene and styrene.

342.    On May 14, 2017, the updated crumb rubber sampling and analysis procedure was implemented to add an analysis for 1,3-butadiene and styrene, and according to Firestone, the updated procedure was implemented on May 14, 2017 to sample for the additional HAPs.

343.     As a result of its failure to analyze dryer crumb rubber samples for all HAPs including 1,3-butadiene and styrene, Firestone violated 40 C.F.R. § 63.494(a)(2)(i), SR 2, 10, 19, 28, and 37 of the V3 Federal Operating Permit, SR 3, 11, 19, 27, and 35 of the V4-V5 Federal Operating Permits, SR 2, 9, 16, 23, and 30 of the V6 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

Subclaim 3B: Failure to Limit Excursions
(40 C.F.R. § 63.505(i))

344.     Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 183-198, 230-247, and 265-268 as if fully set forth herein.

345.     Pursuant to 40 C.F.R. § 63.495(a), Firestone was required to demonstrate compliance with residual organic HAP limitations by taking at least one representative sample of rubber polymer each operating day.

346.     An excursion occurs when less than 75 percent of the daily samples required in one month are taken and analyzed in accordance with the provisions of 40 C.F.R. § 63.495(b). 40 C.F.R. § 63.505(h)(1)(ii).

347.     An owner is allowed one excused "excursion" for each control or recovery device for each semiannual reporting period. 40 C.F.R. § 63.505(i).

348.     During the November 20, 2013-May 19, 2014 semiannual reporting period, Firestone had three excursions for desolventization line 8: 73 percent of operating days in November, 74 percent of operating days in January, and 72 percent of operating days in March.

349.     As a result, Firestone had one excused excursion and two unexcused excursions during that time period.

350.    During the May 20, 2014-November 19, 2014 semiannual reporting period, Firestone had two excursions for crumb desolventization line 6: 74 percent of operating days in May, and 73 percent of operating days in September.

351.    As a result, Firestone had one excused excursion and one unexcused excursion during that time period.

352.    During the November 20, 2015-May 19, 2016 semiannual reporting period, Firestone had two excursions for crumb desolventization line 6: 71 percent of operating days in December, and 70 percent of operating days in April.

353.    As a result, Firestone had one excused excursion and one unexcused excursion during that time period.

354.    As a result of its failure to sample Facility's crumb desolventization lines as often as required, Firestone violated 40 C.F.R. § 63.505(i) on numerous occasions from 2013-2016.

355.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for injunctive relief and civil penalties for Subclaims 3A and 3B, which occurred between 2013 and 2016. Pursuant to La. R.S. 30:2025, Firestone is liable to LDEQ for injunctive relief and civil penalties for Subclaims 3A and 3B.

## FOURTH CLAIM FOR RELIEF

### Failure to Properly Operate and Maintain Storage Vessels in a Manner Consistent with Safety and Good Air Pollution Control Practices for Minimizing Emissions
(40 C.F.R. § 63.483)

356.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 183-198, 230-247, and 265-268 as if fully set forth herein.

357.    Pursuant to 40 C.F.R. § 63.483, Firestone was required to operate and maintain any affected source, including assigned storage vessels, in a manner consistent with safety and

good air pollution control practices for minimizing emissions, and implement operation and maintenance procedures to ensure compliance with the standard.

358.    During the 2016 NEIC Inspection, NEIC identified storage vessel F-148, which was installed in 2006. Storage vessel F-148 stores unpurified solvent (hexanes).

359.    In its April 19, 2016 operation and maintenance procedures, titled "Startup Shutdown Malfunction Plan," Firestone failed to include storage vessel F-148.

360.    As a result, Firestone's operation and maintenance procedures could not ensure that Firestone operated and maintained storage vessel F-148 in a manner consistent with safety and good air pollution control practices for minimizing emissions.

361.    As a result, Firestone violated 40 C.F.R. § 63.483.

362.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for civil penalties for these violations from 2016 through 2017. Pursuant to La. R.S. 30:2025(E)(1)(a), Firestone is liable to LDEQ for civil penalties for the violations set forth above.

## FIFTH CLAIM FOR RELIEF

### Failure to Operate Flare with the Required Net Heating Value of the Gas Being Combusted, Required Exit Velocity, and with No Visible Emissions; Maintain Flare Records; Operate and Maintain Flare in Manner Consistent with Safety and Good Air Pollution Control Practices for Minimizing Emissions

Subclaim 5A: Failure to Maintain Required Heat Content of the Flare Vent Gas
(40 C.F.R. § 63.11(b)(6)(ii), Federal Operating Permits,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

363.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-198, 230-247, and 256-268 as if fully set forth herein.

364.    Pursuant to 40 C.F.R. § 63.11(b)(6)(ii) and its V4-V6 Federal Operating Permits, Firestone was required to operate its Primary Flare with a net heating value of the gas being combusted at 300 BTU/scf or greater.

365.    According to Firestone's 2016 and 2017 Annual Compliance Certifications for the Facility, Firestone's Primary Flare gas heating value block hourly average dropped below 300 BTU/scf on the following occasions:

| Date | Hours of Operation when Flare's Hourly Average Below 300 BTU/scf | Total hours below 300 BTU/scf |
|---|---|---|
| 5/13/16 | 07:00 – 08:00 | 1 |
| 9/16/16 | 00:00 - 01:00 | 1 |
| 10/27/16 | 12:00 - 13:00 | 1 |
| 11/7/16 | 07:00 - 08:00 | 1 |
| 11/29/16 | 17:00 - 18:00 | 1 |
| 3/13/17 | 00:00 - 01:00 | 1 |
| 9/7/17 | 10:00 - 11:00 | 1 |
| 10/19/17 | 20:00 - 21:00 | 1 |
| 10/20/17 | 04:00 - 05:00 | 1 |

366.    As a result of its failure to operate the Primary Flare with a net heating value of the gas being combusted at 300 BTU/scf or greater, Firestone violated 40 C.F.R. § 63.11(b)(6)(ii), SR 57 of the V4-V5 Federal Operating Permits, SR 51 of the V6 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

**Subclaim 5B: Visible Smoke from Primary Flare**
(40 C.F.R. § 63.11(b)(4), Federal Operating Permit,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

367.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-176, 183-198, 230-247, 256-261, and 265-268 as if fully set forth herein.

368.    Pursuant to 40 C.F.R. § 63.11(b)(4) and the V3 Federal Operating Permit, Firestone's Primary Flare must be designed for and operated with no visible emissions, except for periods not to exceed a total of five minutes during any two consecutive hours.

369.     According to Firestone's first 2013 Semiannual Title V Deviation Report, emissions from the Primary Flare were visible for more than five minutes during two consecutive hours on each of the following days: June 9-13, 2013 and June 29, 2013.

370.     As a result of its failure to operate the Primary Flare with no visible emissions, Firestone violated 40 C.F.R. § 63.11(b)(4), SR 55 of the V3 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

Subclaim 5C: Failed to Ensure Flare Gas Exit Velocity
(40 C.F.R. § 63.11(b)(7)(i), Federal Operating Permits,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

371.     Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-198, 230-247, and 256-268 as if fully set forth herein.

372.     Pursuant to 40 C.F.R. § 63.11(b)(7)(i) and its V4-V5 Federal Operating Permits, Firestone was required to operate its Primary Flare with an exit velocity less than 18.3 m/sec (60 ft/sec).

373.     Firestone was required to test its Primary Flare, which is a steam-assisted flare, to ensure that it is designed for and operated with an exit velocity less than 18.3 m/sec (60 ft/sec).

374.     Firestone used the flare tip diameter when calculating the exit velocity in order to determine compliance.

375.     According to Firestone's first 2016 Semiannual Title V Deviation Report, Firestone replaced the Primary Flare's flare tip in 2007 but failed to ensure the new flare tip diameter was the same as the previous flare tip.

376.     As a result, Firestone could not ensure that its Primary Flare was operated with an exit velocity less than 18.3 m/sec (60 ft/sec) from 2013-2016 in violation of 40 C.F.R. § 63.11(b)(7)(i), SR 59 of the V3 Federal Operating Permit, SR 58 of the V4-V5 Federal

Operating Permits, SR 52 of V6 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

### Subclaim 5D: Failure to Keep Records of February 2014 Flare Gas Exit Velocity
(40 C.F.R. § 63.506(d), Federal Operating Permit,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

377.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-176, 183-198, 230-247, 256-261, and 265-268 as if fully set forth herein.

378.    Pursuant to 40 C.F.R. § 63.506(d) and its V3 Federal Operating Permit, Firestone was required to keep records of flare monitoring activities to ensure each flare is operated with the proper exit velocity.

379.    According to Firestone's 2014 Annual Compliance Certification, Firestone failed to keep records of February 2014 monitoring data for flare exit velocity.

380.    As a result of its failure to keep records of flare exit velocity data, Firestone violated 40 C.F.R. § 63.506(d), SR 237 of the V3 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

### Subclaim 5E: Failure to Maintain Flare in a Manner Consistent with
Good Air Pollution Control Practices
(40 C.F.R. § 63.483(a))

381.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 183-198, 230-247, and 265-268 as if fully set forth herein.

382.    Pursuant to 40 C.F.R. § 63.483(a), Firestone was required to operate its Primary Flare in a manner consistent with safety and good air pollution control practices for minimizing emissions.

383.    Flares are used at synthetic rubber polymer manufacturing facilities like Firestone's Facility.

384.    Gas generated by facility operations that is directed to a flare for combustion is known as "vent gas."

385.    "Steam-assisted" flares use steam that is piped to the flare tip and injected into the combustion zone to assist in combustion by promoting turbulence within a flare's flame.

386.    Flares constitute "air pollution control equipment" within the meaning of 40 C.F.R. § 63.483(a).

387.    Flares constitute a "combustion device" and "control equipment" within the meaning of LAC Title 33:III.Chapter 1.

388.    Flares are designed, in part, to achieve high combustion efficiency of VOCs and HAPs.

389.    The steam-to-vent-gas ratio is one operational parameter used to monitor flare operation and combustion efficiency. The net heating value ("NHV") of the gases in the combustion zone of a flare ("Combustion Zone Gas") is another operational parameter that is an indicator of flare combustion efficiency.

390.    As part of its design, a steam-assisted flare must be operated within a range of steam-to-vent gas ratios that, at one end, avoids smoking through an insufficient steam-to-vent gas ratio, and on the other end, avoids incomplete combustion due to an excessive steam-to-vent gas ratio. Both insufficient and excessive steam-to-vent gas ratios reduce VOC and HAP combustion efficiency below a flare's designed efficiency.

391.    Excessive levels of assist-steam will reduce combustion efficiency and may effectively quench or snuff the flame.

392.    In order to monitor an assisted flare to ensure that it is operated and maintained in conformance with its design, several actions must be taken: monitor the amount of vent gas and

either assist-steam or assist-air flowing to the flare, calculate the ratio of the flows of vent gas to either assist-steam or assist-air, and subject the flow of assist-steam or assist-air to sufficient control to enable increase or decrease of flow to maintain a design-appropriate steam-to-vent gas ratio and a high VOC combustion efficiency.

393.    Good air pollution control practices to minimize emissions from flares include, inter alia, combusting essentially all molecules of hydrocarbons (which include VOCs) and HAPs in the vent gas sent to a flare. In order to allow for complete combustion of these substances, vent gas must have sufficient heating value and oxygen.

394.    For assisted flares, good air pollution control practices to minimize emissions from flares requires, inter alia, injecting assist-steam at a rate that maximizes flame stability and flare combustion efficiency.

395.    In order to inject assist-steam at a proper rate, good air pollution control practices to minimize emissions from assisted flares includes taking the following actions: monitor the amount of vent gas and assist-steam flowing to the flare, calculate the ratio of the flows of vent gas to assist-steam, subject the flow of assist-steam to sufficient control to enable increasing or decreasing it in order to optimize the steam-to-vent gas ratio, maintain a sufficient net heating value in the combustion zone ("NHVcz"), and maintain a high VOC and HAP combustion efficiency.

396.    Firestone responded to an EPA CAA Information Request for flare operating data for the period from Oct. 1, 2015 to February 15, 2016.

397.    During the April 19-27, 2016 NEIC Inspection, EPA used a forward looking infrared ("FLIR") camera and observed uncombusted hydrocarbons emitting from the Facility's Primary Flare.

398. On April 29, 2018, EPA used the FLIR camera and observed uncombusted hydrocarbons emitting from the Facility's Primary Flare.

399. Based on data submitted by Firestone and observations made by EPA of the Facility's Primary Flare, on numerous occasions from Oct. 1, 2015 to February 15, 2016, during the April 19-27, 2016 NEIC Inspection, and on April 29, 2018, Firestone operated the Primary Flare without sufficient Net Heating Value in the Combustion Zone Gas.

400. By operating the Primary Flare at an insufficient NHVcz, Firestone reduced combustion efficiency and the operations resulted in excessive emissions from the Primary Flare to the atmosphere of un-combusted HAPs and hydrocarbons (including VOCs), CO, and other pollutants.

401. Each operating day during the periods indicated above, Firestone operated the Primary Flare with an excessively high steam-to-vent gas ratio.

402. Operating the Primary Flare with a high steam-to-vent gas ratio increased the likelihood of flame quenching or snuffing, reduced flare combustion efficiency, and resulted in excessive emissions from the Primary Flare to the atmosphere of un-combusted HAPs and hydrocarbons (including VOCs), CO, and other pollutants.

403. Each operating day during the periods indicated above, Firestone failed to install, or failed to utilize properly, Vent Gas flow monitors and steam flow monitors at its Primary Flares, and failed to have sufficient controls on steam flow to maintain a steam-to-vent gas ratio that minimized emissions at the Facility.

404. Each operating day during the periods indicated above, Firestone's operation of its Primary Flare with an insufficient NHVcz, without monitoring the NHVcz, with excessively high steam-to-vent gas ratios, and without sufficient controls on its steam to optimize the steam

injection rate violated the requirement to operate the Primary Flare in a manner consistent with good air pollution control practices for minimizing emissions.

405.     As a result of the Facility's failure to maintain the steam coming from its Primary Flare in a way to minimize emissions, Firestone violated 40 C.F.R. § 63.483(a) on numerous occasions from Oct 1, 2015 to February 15, 2016, during the April 19-27, 2016 NEIC Inspection, and on April 29, 2018.

406.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for injunctive relief and civil penalties for Subclaims 5A through 5E, which occurred between 2013 and 2017. Pursuant to La. R.S. 30:2025, Firestone is liable for injunctive relief and civil penalties Subclaims 5A through 5E.

### *Permit Violations*

### SIXTH CLAIM FOR RELIEF

### Exceedances of Annual Permitted Limits and Hourly Permitted Emission Rates for 2013 through 2017 and Emissions of Unpermitted Pollutants

Subclaim 6A Dryer Cap Annual Permit Limit Exceedances and Emissions of Unpermitted Pollutants
(Federal Operating Permits, LAC 33:III.501.C2 and C4, LAC 33:III.507.B.2)

407.     Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 143-198, 230-232, and 256-268 as if fully set forth herein.

408.     According to Firestone's Emissions Reporting and Inventory Center ("ERIC") data submitted to LDEQ and other information obtained by EPA, the following exceedances of permitted limits and unpermitted emissions occurred from the Facility's Dryer Cap from 2013 through 2017:

| Pollutant | Year | Permit | Permit Limit/Not Permitted "NP")[1] | Actual Emissions | Permit Exceedance/ Unpermitted Emissions |
|---|---|---|---|---|---|
| Criteria Pollutants | | | (tpy) | (tpy) | (tpy) |
| PM$_{10}$ | 2014 | V3 Permit | 0.53 | 0.55 | 0.02 |
| | 12 month rolling averages for Dec 2014– Mar 2015 | | 0.53 | 0.56 | 0.03 |
| NO$_x$ | 2014 | V3 Permit | 6.95 | 7.10 | 0.15 |
| | 12 month rolling averages for Dec 2014– Mar 2015 | | 6.95 | 7.35 | 0.4 |
| CO | 2014 | V3 Permit | 5.84 | 5.96 | 0.12 |
| | 12 month rolling averages for Dec 2014– Mar 2015 | | 5.84 | 6.18 | 0.34 |
| VOC | 2013 | V3 Permit | 1380.52 | 1451.00 | 70.48 |
| | 2014 | V3 Permit | 1380.52 | 1595.91 | 215.39 |
| | 2015 | V3 and V4 Permits | 1380.64 | 1473.19 | 92.55 |
| | 2016 | V4 and V5 Permits | 1380.64 | 2043.55 | 662.91 |
| | 2017 | V5 and V6 Permits | 1380.64 | 1819.20 | 438.56 |
| HAPs | | | (lbs/yr) | (lbs/yr) | (lbs/yr) |
| n-hexane | 2013 | V3 Permit | 1,723,800 | 1,733,268.80 | 9,468.80 |
| | 2014 | V3 Permit | 1,723,800 | 1,909,938.94 | 186,138.94 |
| | 2015 | V3 and V4 Permits | 1,723,800 | 1,758,997.99 | 35,197.99 |
| | 2016 | V4 and V5 Permits | 1,723,800 | 2,436,401.11 | 712,601.11 |
| | 2017 | V5 and V6 Permits | 1,723,800 | 2,106,608.70 | 382,808.70 |
| 1,3-butadiene | 2013 | V3 Permit | NP | 2083.56 | 2083.56 |

[1] "Not Permitted" means the pollutant was not permitted at the time of the violation.

| | 2014 | V3 Permit | NP | 1931.61 | 1931.61 |
|---|---|---|---|---|---|
| | 2015 | V3 and V4 Permits | NP | 1862.56 | 1862.56 |
| | 2016 | V4 and V5 Permits | NP | 2084.36 | 2084.36 |
| | 2017 | V5 and V6 Permits | NP | 1500.78 | 1500.78 |
| Styrene | 2013 | V3 Permit | 90,260 | 127,444.61 | 37,184,61 |
| | 2014 | V3 Permit | 90,260 | 140,288.08 | 50,028.08 |
| | 2015 | V3 and V4 Permits | 90,260 | 128,272.84 | 38,012.84 |
| | 2016 | V4 and V5 Permits | 90,260 | 151,882.45 | 61,622.45 |
| | 2017 | V5 and V6 Permits | 90,260 | 128,287.46 | 38,027.46 |
| Formaldehyde | 2017 | V5 and V6 Permits | NP | 7,500 | 7,500 |
| Naphthalene | 2016 | V4 and V5 Permits | NP | 280 | 280 |
| | 2017 | V5 and V6 Permits | NP | 3,280 | 3,280 |

409.    As a result of exceeding its Dryer Cap annual permit limits and emitting unpermitted pollutants on multiple occasions from 2013-2017, Firestone violated the V3-V6 Federal Operating Permits, LAC 33:III.501.C2 and C4, and LAC 33:III.507.B.2.

Subclaim 6B: Facility Dryers Permitted Maximum Hourly Emission Rate Exceedances
(Federal Operating Permit, LAC 33:III.501.C.4, LAC 33:III.507.B.2)

410.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-176, 183-198, 230-247, 256-261, and 265-268 as if fully set forth herein.

411.    Pursuant to the V3 Federal Operating Permit, the Facility was required to meet the following permitted maximum hourly emission rates for Dryer Lines 20-22 from December 2014 to March 2015:

| Pollutant | Maximum Emission Rate Limit (lb/hr) |
|---|---|
| $NO_x$ | 0.08 |

| | |
|---|---|
| CO | 0.67 |
| PM$_{10}$ | 0.06 |

412.    According to reports submitted by Firestone, the following emission rate

exceedances occurred for Facility Dryer Lines 20-22 in 2014 and 2015:

| Dryer Line | Date | Number of Hours Exceedance | NO$_x$ | PM$_{10}$ | CO |
|---|---|---|---|---|---|
| 20 | 12/2/2014 | 3 | x | | x |
| | 12/19/2014 | 7 | x | x | x |
| | 12/19/2014 | 1 | x | | x |
| 21 | 12/10/2014 | 1 | x | | x |
| | 3/2/2015 | 3 | x | | x |
| | 3/2/2015 | 1 | | | x |
| 22 | 12/6/2014 | 2 | x | | x |
| | 12/7/2014 | 5 | x | | x |
| | 12/7/2014 | 19 | x | x | x |
| | 12/8/2014 | 21 | x | x | x |
| | 12/8/2014 | 1 | x | | x |
| | 12/9/2014 | 10 | x | x | x |
| | 12/9/2014 | 5 | x | | x |
| | 12/28/2014 | 2 | x | | x |
| | 12/29/2014 | 3 | x | | x |
| | 12/29/2014 | 1 | | | x |
| | 1/12/2015 | 1 | x | | x |
| | 1/13/2015 | 8 | x | | x |
| | 1/14/2015 | 1 | x | x | x |
| | 1/14/2015 | 5 | x | | x |
| | 3/31/2015 | 2 | x | | x |

413.    As a result of exceeding its permitted maximum hourly emission rates on at least

102 occasions from December 2014 through March 2015, Firestone violated the V3 Federal

Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

Subclaim 6C: Flare Cap Annual Permit Limit Exceedances and Emissions of Unpermitted
Pollutants
(Federal Operating Permits, LAC 33:III.501.C.2 and 4, LAC 33:III.507.B.2)

414.    Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 143-198, and

256-268 as if fully set forth herein.

415.    Pursuant to the V3-V6 Federal Operating Permits, the Facility was required to comply with specific permitted emission limits for the Flare Header System from 2014-2017, as specified in the table below.

416.    According to Firestone's 2013-2017 ERIC data submitted to LDEQ and other information obtained by EPA, the following emission exceedances of permit limits and unpermitted emissions occurred from the Facility's Flare Header System in 2013-2017:

| Pollutant | Year | Permit Number(s) | Permit Limit/NP | Actual Emissions | Permit Exceedance/ Unpermitted Emissions |
|---|---|---|---|---|---|
| Criteria Pollutants | | | (tpy) | (tpy) | (tpy) |
| PM2.5 and PM10 | 2013 | V3 Permit | NP | 0.12 | 0.12 |
| | 2014 | V3 Permit | NP | 0.11 | 0.11 |
| sulfur dioxide ("SO2") | 2014 | V3 Permit | NP | 0.01 | 0.01 |
| VOC | 2013 | V3 Permit | 9.45 | 21.40 | 11.95 |
| | 2014 | V3 Permit | 9.45 | 18.46 | 9.01 |
| | 2015 | V3 & V4 Permits | 13.24 | 17.98 | 4.74 |
| | 2016 | V4 & V5 Permits | 13.24 | 19.42 | 6.18 |
| HAPs | | | (lbs/yr) | (lbs/yr) | (lbs/yr) |
| 1,3-butadiene | 2013 | V3 Permit | 1,300 | 13,607.09 | 12,307.09 |
| | 2014 | V3 Permit | 1,300 | 12,441.88 | 11,141.88 |
| | 2015 | V3 & V4 Permits | 9,740 | 12,041.05 | 2,301.05 |
| | 2016 | V4 & V5 Permits | 9,740 | 12,616.08 | 2,876.08 |
| | 2017 | V5 & V6 Permits | 9,740 | 10,878.17 | 1,138.17 |
| n-hexane | 2013 | V3 Permit | 6,060 | 8,526.44 | 2,466.44 |
| | 2014 | V3 Permit | 6,060 | 7,507.74 | 1,447.74 |
| | 2016 | V4 & V5 Permits | 7,180 | 8,981.46 | 1,801.46 |
| methyl chloride | 2013 | V3 Permit | NP | 11.02 | 11.02 |
| | 2014 | V3 Permit | NP | 9.70 | 9.70 |
| | 2013 | V3 Permit | NP | 0.03 | 0.03 |

| Pollutant | Year | Permit Number(s) | Permit Limit/NP | Actual Emissions | Permit Exceedance/ Unpermitted Emissions |
|---|---|---|---|---|---|
| methyl isobutyl ketone ("MIBK") | 2014 | V3 Permit | NP | 0.03 | 0.03 |
| | 2015 | V3 & V4 Permits | NP | 0.03 | 0.03 |
| | 2017 | V5 & V6 Permits | NP | 0.03 | 0.03 |
| Toluene | 2013 | V3 Permit | NP | 24.51 | 24.51 |
| | 2014 | V3 Permit | NP | 21.58 | 21.58 |
| | 2016 | V4 & V5 Permits | 20 | 21.914 | 1.914 |

417.    As a result of exceeding its annual permitted emission limits and emitting unpermitted emissions from its Flare Header System on multiple occasions from 2013-2017, Firestone violated the V3-V6 Federal Operating Permits, LAC, 33:III.501.C.2 and 4, and LAC 33:III.507.B.2.

Subclaim 6D: Laboratory Fugitives Permit Limit Exceedances and
Emissions of Unpermitted Pollutants
(Federal Operating Permits, LAC 33:III.501.C.2 and 4, LAC 33:III.507.B.2)

418.    Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 143-198, and 2567-268 as if fully set forth herein.

419.    Pursuant to the V3-V6 Federal Operating Permits, the Facility was required to comply with specific permitted emission limits for laboratory fugitives from 2013-2017, as specified in the table below.

420.    According to Firestone's 2013 - 2017 ERIC data submitted to LDEQ and other information obtained by EPA, the following emissions exceedances of permit limits and unpermitted emissions from the Facility's Laboratory in 2013 - 2017:

| Pollutant | Year | Permit Number(s) | Permitted Emissions/NP | Reported Emissions | Permit Exceedance/ Unpermitted Emissions |
|---|---|---|---|---|---|
| Criteria Pollutants | | | (tpy) | (tpy) | (tpy) |
| VOC | 2013 | V3 Permit | 16.84 | 21.71 | 4.87 |
| | 2014 | V3 Permit | 16.84 | 21.71 | 4.87 |
| | 2015 | V3 and V4 Permits | 16.84 | 21.71 | 4.87 |
| | 2016 | V4 and V5 Permits | 16.84 | 21.77 | 4.93 |
| | 2017 | V5 and V6 Permits | 16.84 | 18.67 | 1.84 |
| HAPs | | | (lbs/yr) | (lbs/yr) | (lbs/yr) |
| n-hexane | 2013 | V3 Permit | 22,900 | 33,453.31 | 10,553.31 |
| | 2014 | V3 Permit | 22,900 | 33,453.31 | 10,553.31 |
| | 2015 | V3 and V4 Permits | 22,900 | 33,453.31 | 10,553.31 |
| | 2016 | V4 and V5 Permits | 22,900 | 33,544.94 | 10,644.94 |
| | 2017 | V5 and V6 Permits | 22,900 | 28,596.68 | 5,696.68 |
| 1,3-butadiene | 2013 | V3 Permit | NP | 428.76 | 428.76 |
| | 2014 | V3 Permit | NP | 428.76 | 428.76 |
| | 2015 | V3 and V4 Permits | NP | 428.76 | 428.76 |
| | 2016 | V4 and V5 Permits | NP | 429.93 | 429.93 |
| | 2017 | V5 and V6 Permits | NP | 366.79 | 366.79 |
| Styrene | 2013 | V3 Permit | NP | 0.96 | 0.96 |
| | 2014 | V3 Permit | NP | 0.96 | 0.96 |
| | 2015 | V3 and V4 Permits | NP | 0.96 | 0.96 |
| | 2016 | V4 and V5 Permits | NP | 0.96 | 0.96 |
| | 2017 | V5 and V6 Permits | NP | 0.96 | 0.96 |
| carbon disulfide | 2013 | V3 Permit | NP | 477.78 | 477.78 |
| | 2014 | V3 Permit | NP | 477.78 | 477.78 |
| | 2015 | V3 and V4 Permits | NP | 477.78 | 477.78 |
| | 2016 | V4 and V5 Permits | NP | 477.78 | 477.78 |

| Pollutant | Year | Permit Number(s) | Permitted Emissions/NP | Reported Emissions | Permit Exceedance/ Unpermitted Emissions |
|---|---|---|---|---|---|
| | 2017 | V5 and V6 Permits | NP | 477.78 | 477.78 |
| methylene chloride | 2013 | V3 Permit | NP | 75.85 | 75.85 |
| | 2014 | V3 Permit | NP | 75.85 | 75.85 |
| | 2015 | V3 and V4 Permits | NP | 75.85 | 75.85 |
| | 2016 | V4 and V5 Permits | NP | 75.85 | 75.85 |
| | 2017 | V5 and V6 Permits | NP | 75.85 | 75.85 |
| Methanol | 2013 | V3 Permit | NP | 64.78 | 64.78 |
| | 2014 | V3 Permit | NP | 64.78 | 64.78 |
| | 2015 | V3 and V4 Permits | NP | 64.78 | 64.78 |
| | 2016 | V4 and V5 Permits | NP | 64.78 | 64.78 |
| | 2017 | V5 and V6 Permits | NP | 64.78 | 64.78 |
| Toluene | 2013 | V3 Permit | NP | 45.46 | 45.46 |
| | 2014 | V3 Permit | NP | 45.46 | 45.46 |
| | 2015 | V3 and V4 Permits | NP | 45.46 | 45.46 |
| | 2016 | V4 and V5 Permits | NP | 45.46 | 45.46 |
| | 2017 | V5 and V6 Permits | NP | 45.46 | 45.46 |

421.    As a result of exceeding its laboratory fugitive permit limits and emitting unpermitted pollutants on numerous occasions from 2013-2017, Firestone violated the LAC, 33:III.501.C.2 and 4, LAC 33:III.507.B.2, and V3-V6 Federal Operating Permits.

<u>Subclaim 6E: Cooling Tower Permit Limit Exceedances and Emissions of Unpermitted Pollutants</u>
(Federal Operating Permits, LAC 33:III.501.C.2 and 4, LAC 33:III.507.B.2)

422.    Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 143-198, and 256-268 as if fully set forth herein.

423.    Pursuant to the V3-V4 Federal Operating Permits, the Facility was not authorized to discharge VOCs, 1,3-butadiene, n-hexane, or styrene from Facility Cooling Towers from 2013-2015.

424.    Pursuant to the V4-V6 Federal Operating Permits, the Facility was required to meet the following Facility Cooling Tower permit emission limits for VOCs, 1,3-butadiene, n-hexane, and styrene from 2016-2017.

425.    According to Firestone's 2013 - 2017 ERIC Emission Inventory data submitted to LDEQ and other information obtained by EPA, the following exceedances of permitted limits and unpermitted emissions occurred from the Facility's Cooling Towers from 2013-2017:

| Pollutant | Year | Permit Number(s) | Permitted Emissions/NP | Reported Emissions | Permit Exceedance/ Unpermitted Emissions |
|---|---|---|---|---|---|
| Criteria Pollutants | | | (tpy) | (tpy) | (tpy) |
| VOC | 2013 | V3 Permit | NP | 67.93 | 67.93 |
| | 2014 | V3 Permit | NP | 64.79 | 64.79 |
| | 2015 | V3 and V4 Permit | NP | 127.70 | 127.70 |
| | 2016 | V4 and V5 Permits | 6.38 | 65.35 | 58.97 |
| | 2017 | V5 and V6 Permits | 6.38 | 37.67 | 31.29 |
| HAPs | | | (lb/yr) | (lb/yr) | (lb/yr) |
| 1,3-butadiene | 2013 | V3 Permit | NP | 68,675.82 | 68,675.82 |
| | 2014 | V3 Permit | NP | 85,871.56 | 85,871.56 |
| | 2015 | V3 and V4 Permit | NP | 101,809.18 | 101,809.18 |
| | 2016 | V4 and V5 Permits | 4,800 | 44,474.41 | 39,674.41 |
| n-hexane | 2013 | V3 Permit | NP | 67,183.83 | 67,183.83 |
| | 2014 | V3 Permit | NP | 43,716.50 | 43,716.50 |
| | 2015 | V3 and V4 Permit | NP | 153,584.36 | 153,584.36 |
| | 2016 | V4 and V5 Permits | 7,940 | 86,219.23 | 78,279.23 |
| | 2017 | V5 and V6 Permits | 7,940 | 67,280.38 | 59,340.38 |

| Pollutant | Year | Permit Number(s) | Permitted Emissions/NP | Reported Emissions | Permit Exceedance/ Unpermitted Emissions |
|---|---|---|---|---|---|
| Styrene | 2017 | V5 and V6 Permits | 20 | 188.17 | 168.17 |

426.    As a result of exceeding its annual permit limits and emitting unpermitted pollutants from its Cooling Towers for multiple pollutants from 2013-2017, Firestone violated LAC 33:III.507.B.2, LAC 33:III.501.C.2 and 4, and the V3-V6 Federal Operating Permits.

Subclaim 6F: Storage Tank Permit Limit Exceedance
(Federal Operating Permit, LAC 33:III.501.C.4, LAC 33:III.507.B.2)

427.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-176, 183-198, 230-247, 256-261, and 265-268 as if fully set forth herein.

428.    Pursuant to the V4 Federal Operating Permit, the Facility's annual limit for VOC emissions from Low Pressure Storage Tanks Cap was 2.40 tpy.

429.    Pursuant to SR of the V4 Federal Operating Permit, Firestone was required to calculate total emissions from the tanks based on the throughput and record the emissions each month as well as the total emissions calculated for the last 12 months.

430.    According to Firestone's First 2016 Semiannual Monitoring Report, the Facility determined that the VOC emissions from the Low Pressure Storage Tanks CAP for the 12-month period ending in February 2016 were 2.46 tons which was 0.6 tons above its permitted limit.

431.    As a result of exceeding its permitted VOC emission limit for the Low Pressure Storage Tanks Cap for the 12-month period ending February 2016, Firestone violated the V4 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

432.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for injunctive relief and civil penalties for Subclaims 6A through 6F, which

occurred between 2013 and 2017.  Pursuant to La. R.S. 30:2025, Firestone is liable to LDEQ for injunctive relief and civil penalties for Subclaims 6A through 6F.

## **SEVENTH CLAIM FOR RELIEF**

### **Operating Equipment without a Permit Authorization**

Subclaim 7A: Failure to Receive Authorization
Prior to Operation of the Carbon Adsorption System
(LAC 33:III.501.C.2)

433.    Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 143-198, and 256-268 as if fully set forth herein.

434.    On November 8, 2017, Firestone submitted an Authorization to Construct/Approval to Operate ("ATC/ATO") application to LDEQ for the installation and operation of a carbon adsorption system to control fugitive VOCs and HAPs from the Facility's laboratory.

435.    According to a letter Firestone sent to LDEQ on December 20, 2017, Firestone installed and began operating the carbon adsorption system on December 1, 2017.

436.    LDEQ issued the ATC/ATO to Firestone on December 4, 2017.

437.    Because Firestone began construction and operated the carbon adsorption system from December 1, 2017 to December 3, 2017, before LDEQ approved the permit (i.e. the ATC/ATO), Firestone violated LAC 33:III.501.C.2.

Subclaim 7B: Failure to Operate Pump Engines under a Permit
(LAC 33:III.501.C.2)

438.    Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 143-198, and 256-268 as if fully set forth herein.

439. During a LDEQ CAA inspection of Firestone's Facility on September 25, 2013, inspectors identified three internal combustion pump engines, PE-07, PE-08, and PE-09, operating without a permit.

440. Pump engines PE-07, PE-08, and PE-09 began operation in 2010 and were permitted to operate July 19, 2015.

441. Based on Firestone's 2016 and 2017 Annual Compliance Certifications and first 2016 Semiannual Title V Deviation Report, Firestone operated pump engines PE-10 and PE-11 in 2016 and 2017.

442. Pump engines PE-10 and PE-11 were not permitted to operate until June 30, 2017.

443. As a result of Firestone's failure to include all of the Facility's pump engines in its Operating Permits, Firestone violated LAC 33:III.501.C.2.

<u>Subclaim 7C: Failure to Operate Tanks under a Permit</u>
(LAC 33:III.501.C.2)

444. Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 143-198, and 256-268 as if fully set forth herein.

445. According to Firestone's 2016 and 2017 Annual Compliance Certifications for the Facility, the Facility operated the following four tanks without a permit from 2016-2017: F-148; Fa-121A; F-325; and F-326.

446. As a result of Firestone's failure to include all of the Facility's tanks in its V4-V5 Federal Operating Permits from 2016-2017, Firestone violated LAC 33:III.501.C.2.

<u>Subclaim 7D: Loading Distillation Bottoms without a Permit</u>
(LAC 33:III.501.C.2)

447.     Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 143-198, and 256-268 as if fully set forth herein.

448.     According to Firestone's first 2016 Semiannual Title V Deviation Report for the Facility, the Facility loaded distillation bottoms into tank trucks without a permit.

449.     As a result of Firestone's failure to include the emission source for truck loading of distillation column bottoms in its Operating Permits, Firestone violated LAC 33:III.501.C.2.

450.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for civil penalties for Subclaims 7A through 7D, which occurred between 2013 and 2017. Pursuant to La. R.S. 30:2025(E)(1)(a), Firestone is liable to LDEQ for civil penalties for Subclaims 7A through 7D.

### ***Reporting Violations***

### **EIGHTH CLAIM FOR RELIEF**

Subclaim 8A: Failure to Submit Accurate Semiannual Title V Deviation Reports
(Federal Operating Permits, LAC 33:III.535.A, LAC 33:III.501.C.4, LAC 33:III.507.B.2)

451.     Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 143-198, and 256-268 as if fully set forth herein.

452.     As explained in Claim 6, Firestone violated its V3-V6 Federal Operating Permits by exceeding pollutant and HAP emission limits for various sources. Each of those violations constituted a deviation.

453.     Based on information obtained during the 2016 NEIC Inspection, Firestone failed to take daily residual HAP samples of crumb rubber.  Each of these violations constituted a deviation.

454.    Firestone was responsible for reporting each deviation in the appropriate Title V

Semiannual Deviation Report.

455.    Firestone failed to report the deviations in the appropriate Semiannual Title V

Deviation Reports as identified below:

| Deviation Report | Area | Details | Pollutants |
|---|---|---|---|
| First 2013 | North Cooling Tower | Failed to report accurate emissions for 4/26/13 leak | 1,3-butadiene and n-hexane |
| | Dryer Residual HAP Sampling | Failed to report missed daily sampling | |
| Second 2013 | North Cooling Tower | Failed to report accurate emissions for 11/18/13 leak | 1,3-butadiene and n-hexane |
| | Dryer Residual HAP Sampling | Failed to report missed daily sampling | |
| | | Failed to report excursions | |
| First 2014 | Dryer Residual HAP Sampling | Failed to report missed daily sampling | |
| | | Failed to report excursions | |
| | | Failed to report excursion exceedances | |
| Second 2014 | Flare Cap | Failed to report permit limit exceedances | $PM_{10}$, $PM_{2.5}$, $SO_2$, $NO_x$, CO, VOC, 1,3-butadiene, n-hexane, styrene, methyl chloride, MEK, toluene |
| | Dryer Residual HAP Sampling | Failed to report missed daily sampling | |
| | | Failed to report excursions | |
| | | Failed to report excursion exceedances | |
| First 2015 | North Cooling Tower | Failed to report 6/23/15 leak (reported in Second 2015 Deviation Report) | n-hexane |
| | South Cooling Tower | Failed to report 3/18/15 leak (reported in Second 2015 Deviation Report) | 1,3-butadiene and n-hexane |
| | Dryer Residual HAP Sampling | Failed to report missed daily sampling | |
| | | Failed to report excursions | |
| Second 2015 | South Cooling Tower | Failed to report accurate emissions for 3/18/15 and 6/23/15 leaks | 1,3-butadiene and n-hexane |

| Deviation Report | Area | Details | Pollutants |
|---|---|---|---|
| | Flare Cap | Failed to report permit limit exceedances | 1,3-butadiene, n-hexane, methyl isobutyl ketone |
| | Dryer Residual HAP Sampling | Failed to report missed daily sampling | |
| | | Failed to report excursions | |
| | | Failed to report excursion exceedances | |
| First 2016 | Flare | Failed to report heat content of flare gas below 300 BTU/scf on 6/13/16 | |
| | Dryer Residual HAP Sampling | Failed to report missed daily sampling | |
| | | Failed to report excursions | |
| | | Failed to report excursion exceedances | |
| Second 2016 | Laboratory Fugitives | Failed to report permit limit exceedances | VOCs and n-hexane |
| | Flare Cap | Failed to report permit limit exceedances | 1,3-butadiene, n-hexane, MEK, toluene |
| Second 2017 | Flare Cap | Failed to report permit limit exceedances | 1,3-butadiene, methyl isobutyl ketone |

456.     As a result of its failure to report the deviations in the Semiannual Title V Deviation Reports specified in the table above from 2013 through 2017, Firestone violated SR 273 of the V3 Federal Operating Permit, SR 287 of the V4 Federal Operating Permit, SR 285 of the V5 Federal Operating Permit, SR 306 of the V6 Federal Operating Permit, Part 70 General Conditions K and R of LAC 33:III.535.A, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.  *See* 40 C.F.R. § 70.6(a)(3)(iii)(A).

<u>Subclaim 8B: Failure to Prepare Standby Plans</u>
(LAC 33:III.5609, Federal Operating Permits, LAC 33:III.501.C.4, LAC 33:III.507.B.2, LAC 33:III.5609.A)

457.     Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 143-198, and 256-268 as if fully set forth herein.

458.     Pursuant to LAC 33:III.5609.A and its V4-V5 Operating Permits, Firestone was required to prepare and maintain a standby plan for the reduction of emissions during periods of Air Pollution Alert, Air Pollution Warning and Air Pollution Emergency.

459.     According to its First 2016 Semiannual Title V Deviation Report, the Firestone standby plan from January 1, 2016 to June 30, 2016, did not include provisions for all of the pollutant events that are required to be in the standby plan.

460.     As a result of failing to prepare and maintain complete standby plans from January 1, 2016 to June 30, 2016, Firestone violated LAC 33:III.5609.A, SR 288 of the V4 Federal Operating Permit, SR 286 of the V5 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

461.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for civil penalties for Subclaims 8A and 8B, which occurred between 2013 and 2017. Pursuant to La. R.S. 30:2025(E)(1)(a), Firestone is liable to LDEQ for civil penalties for Subclaims 8A and 8B.

### *Unauthorized Discharge Notifications*

### NINTH CLAIM FOR RELIEF

### Failure to Provide Verbal Notifications to the DPS of Unauthorized Discharges of Air Pollutants from Heat Exchange Systems

2013-2016 Emergency Reporting Violations
(Federal Operating Permits, LAC 33:III.501.C.4, LAC 33:III.507.B.2)

462.     Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 143-198, and 256-268 as if fully set forth herein.

463.    Pursuant to LAC 33:I, Chapter 39 and its V3-V6 Federal Operating Permits, Firestone was required to report to the DPS hotline within 24 hours of any leak that resulted in an unauthorized discharge that exceeded the reportable quantity of a pollutant.

464.    According to the Facility's Heat Exchanger Testing Reports, the 2016 NEIC Inspection, and 7-Day Written Reports of leaks from the Facility's Heat Exchange Systems, Firestone experienced the following nine leaks that exceeded the 10-pound reportable quantity of 1,3-butadiene in a 24-hour period during 2013 through 2017:

| Cooling Tower | Leak Date | 1,3-butadiene (pounds per day) | DPS Hotline Notification Date | Days Late |
|---|---|---|---|---|
| North | 4/26/13 | 777 | None | |
| North | 11/18/13 | 704 | None | |
| North | 4/6/16 | 130 | 4/8/16 | 2 |
| South | 4/23/15 | 426 | None | |
| South | 6/23/15 | 791 | None | |
| South | 9/16/15 | 634 | None | |
| South | 2/18/16 | 422 | 4/1/16 | 42 |
| South | 5/21/16 | 138 | 5/23/16 | 1 |
| South | 7/13/17 | 98 | 7/17/17 | 3 |

465.    Firestone failed to verbally notify the DPS hotline of five leaks and provided notifications beyond 24 hours of four leaks that resulted in a discharge of reportable quantities of 1,3-butadiene.

466.    As a result of its failure to notify the DPS hotline within 24 hours of nine leaks of reportable quantities of pollutants to DPS, Firestone violated LAC 33:III.501.C.4, LAC 33:III.507.B.2, SR 284 of the V3 Federal Operating Permit, SR 298 of the V4 Federal Operating Permit, SR 296 of the V5 Federal Operating Permit, and SR 317 of the V6 Federal Operating Permit.

467.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for civil penalties for these violations from 2013 through 2017. Pursuant to La.

R.S. 30:2025(E)(1)(a), Firestone is liable to LDEQ for civil penalties for the violations set forth above.

## *NESHAP Subpart EEEE*

## TENTH CLAIM FOR RELIEF

### Failure to Comply with NESHAP Subpart EEEE
(40 C.F.R. § 63.2342(b)(1))

468.    Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 195-198, 230-247, and 265-268 as if fully set forth herein.

469.     Firestone has been implementing its organic liquid distribution operation at least since February 5, 2007, the compliance date for existing sources under NESHAP Subpart EEEE.

470.    Firestone submitted the NESHAP Subpart EEEE NOCS on April 20, 2020 to demonstrate the Facility's compliance status with NESHAP Subpart EEEE.

471.    By failing to submit the required NOCS from at least 2014 to April 2020, Firestone's failed to comply with NESHAP Subpart EEEE

472.    As a result of its failure to comply with NESHAP Subpart EEEE from 2007 to 2020, Firestone violated 40 C.F.R. § 63.2342(b)(1).

473.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for civil penalties for these violations from 2013 to April 19, 2020. Pursuant to La. R.S. 30:2025(E)(1)(a), Firestone is liable to LDEQ for civil penalties for the violations set forth above.

## *NESHAP Subpart ZZZZ*

## ELEVENTH CLAIM FOR RELIEF

### Failure to Comply with NESHAP Subpart *ZZZZ*
(40 C.F.R. § 63.6605(a))

92

474.     Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 195-198, 230-247, and 265-268 as if fully set forth herein.

475.     Two of Firestone's diesel engines, Stormwater Effluent Pump PE-10 and Effluent Emergency Generator PE-11, were subject NESHAP Subpart ZZZZ.

476.     The Stormwater Effluent Pump PE-10 engine was initially a portable engine.

477.     The engine, however, remained in the same location for more than 12 consecutive months and thus became a stationary RICE in 2016.

478.     Firestone was required to comply with NESHAP Subpart ZZZZ for both engines when they became stationary RICE in 2016.

479.     LDEQ issued V6 Federal Operating Permit to Firestone on June 30, 2017, which included the two engines as new sources subject to NESHAP Subpart ZZZZ.

480.     As a result of its failure to comply with NESHAP Subpart ZZZZ from 2016-2017, Firestone violated 40 C.F.R. § 63.6605(a).

481.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for civil penalties for these violations from 2013 to June 30, 2017. Pursuant to La. R.S. 30:2025(E)(1)(a), Firestone is liable to LDEQ for civil penalties for the violations set forth above.

### *NESHAP Subpart DDDDD*

### TWELFTH CLAIM FOR RELIEF

### Failure to Maintain Complete Records of NESHAP Subpart DDDDD Boiler Tune-Ups
(40 C.F.R. § 63.7540(a)(10)(vi), Federal Operating Permit,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

482.     Plaintiffs reallege and incorporate by reference Paragraphs 1-96, 143-176, 183-198, 230-247, 256-261, and 265-268 as if fully set forth herein.

483.     Pursuant to 40 C.F.R. § 63.7540(a), Firestone was required to conduct a tune-up on Boiler 8 and Boiler B-900 every 5 years.

484.     When conducting the tune-up, Firestone was required by 40 C.F.R. § 63.7540(a)(10)(v) to measure the concentrations in the effluent stream of CO before and after a tune-up of Boiler 8 and Boiler B-900.

485.     Firestone was then required by 40 C.F.R. § 63.7540(a)(10)(vi) to maintain tune-up records of the CO and oxygen concentrations before and after the tune-up of Boiler 8 and Boiler B-900.

486.     In its NESHAP Subpart DDDDD NOCS, Firestone certified that the facility had completed the required initial tune-up according to 40 C.F.R. § 63.7540(a)(10)(i) through (vi) for Boiler 8 and B-900.

487.     According to the Facility's first 2016 Semiannual Title V Deviation Report, Firestone reported that the tune-up documentation did not include the pre tune-up concentrations for CO and oxygen as required by 40 C.F.R. § 63.7540(a)(10)(vi).

488.     As a result of Firestone not recording the concentrations of CO and oxygen before the tune-ups of Boiler 8 and Boiler B-900 in 2016, Firestone violated 40 C.F.R. § 63.7540(a)(10)(vi) (as referenced by 40 C.F.R. § 63.7540(a)(12)), SR 46 and SR 109 of the V4 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

489.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for civil penalties for this violation that occurred in 2016. Pursuant to La. R.S. 30:2025(E)(1)(a), Firestone is liable to LDEQ for civil penalties for the violation set forth above.

### *Federal and State Chemical Accident Prevention Programs (CAPP)*

## THIRTEENTH CLAIM FOR RELIEF

### Failure to Conduct RMP External and Internal/On-Stream Inspections in Accordance with Good Engineering Practices

Subclaim 13A: Heat Exchangers
(40 C.F.R. § 68.73(d)(3), LAC 33:III.5901.A)

490.     Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 97-129, 183-198, 230-232, 248-252, and 265-268 as if fully set forth herein.

491.     In accordance with good engineering practices, the period between external inspections of Heat Exchangers must not exceed the lesser of five years or the required internal/on-stream inspection. 40 C.F.R. § 68.73(d)(3); 6.4.1 of the API 510 Standard Pressure Vessel Inspection Code.

492.     In accordance with good engineering practices, the period between internal or on-stream inspections of Heat Exchangers shall not exceed the lesser of one half the remaining life of the vessel or ten 10 years. 40 C.F.R. § 68.73(d)(3); 6.5.1.1 of the API 510 Standard Pressure Vessel Inspection Code.

493.     During an NEIC Inspection of the Facility in April of 2016, NEIC noted no records to demonstrate that prior to the Inspection, Firestone had conducted an external inspection of any of its approximately 130 heat exchangers within the last five years.

494.      During the 2016 NEIC Inspection, NEIC noted no records to demonstrate that prior to the Inspection, Firestone had conducted an internal/on-stream inspection of any heat exchanger within the last 10 years.

495.     Based on NEIC's Inspection of the Facility's records, the most recent inspection of the Facility's heat exchangers was an external inspection of Heat Exchanger E-204C performed by Firestone in 2004.

496.     Firestone had not performed more recent inspections of any of the Facility's approximately 130 heat exchangers.

497.     Firestone had not conducted external and internal/on-stream inspections of Heat Exchangers in accordance with good engineering practices.

498.     As a result of its failure to timely inspect the Facility's heat exchangers, Firestone violated the federal CAPP at 40 C.F.R. § 68.73(d)(3). Firestone also violated the separate state CAPP at LAC 33:III.5901.A, which incorporates 40 C.F.R. § 68.73(d)(3) by reference.

<u>Subclaim 13B: Storage Tanks, Spheres and Storage Vessels</u>
(40 C.F.R. § 68.73(d), LAC 33:III.5901.A)

499.     Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 97-129, 183-198, 230-232, 248-252, and 265-268 as if fully set forth herein.

500.     In accordance with good engineering practices, the period between internal or on-stream inspections of a pressure vessel must not exceed one half the remaining life of the pressure vessel or 10 years, whichever is less. 40 C.F.R. § 68.73(d)(3); Section 6.5.1.1 of the API 510 Standard Pressure Vessel Inspection Code.

501.     According to Firestone's records, Firestone failed to timely inspect the following Facility tanks, spheres and other storage vessels and pressure vessels:

| Tank ID/Service | Internal Inspection Date | Source | Subsequent Inspection Data | Source |
|---|---|---|---|---|
| F-431 / OOPs | 9/19/2005 | F-431 Mechanical Integrity Inspection Report dated 9/19/05 | 5/6/2016 | Intertek Risk Based Inspection Report dated May 2016 |
| F-133 / 1,3-butadiene sphere | 12/6/2004 | F-133 Mechanical Integrity Documentation from NEIC Inspection | 3/4/2016 | F-133 and F-322 Risk Based Inspection Assessment Report dated 3/4/2016 |
| F-322 / catalyst knock-out | 2003 | F-133 and F-322 Risk Based Inspection Assessment Report dated 3/4/2016 | 3/4/2016 | F-133 and F-322 Risk Based Inspection Assessment Report dated 3/4/2016 |
| F-458 / boron trifluoride complex feed | 11/11/2003 | F-458 Mechanical Integrity Documentation (pg 25) | 2/5/2014 | F-458 Mechanical Integrity Documentation (pg. 7) |

502.    Based on Firestone's records, Firestone did not conduct an internal or on-stream inspection of OOPS storage tank F-431 within 10 years of the previous internal or on-stream inspection.

503.    Based on Firestone's records, Firestone did not conduct an internal or on-stream inspection of 1,3-butadiene storage sphere F-133 within 10 years of the previous internal or on-stream inspection.

504.    Based on Firestone's records, Firestone did not conduct an internal or on-stream inspection of catalyst knock-out tank F-322 within 10 years of the previous internal or on-stream inspection.

505.    Based on Firestone's records, Firestone did not conduct an internal or on-stream inspection of boron trifluoride complex feed tank F-458 within 10 years of the previous internal or on-stream inspection.

506.    According to the Facility's April 2017 F-148 Inspection Report, low pressure Storage Vessel F-148 was installed in 2006.

507.    According to the same report, Firestone did not conduct an internal inspection of Storage Vessel F-148 until 2017.

508.    Firestone did not conduct an internal inspection of storage vessel F-148 within 10 years of initial service.

509.    As a result of its failure to timely conduct internal or on-stream inspections of tanks and spheres in accordance with good engineering practices on numerous occasions between 2013 and 2016, Firestone violated the federal CAPP at 40 C.F.R. § 68.73(d). Firestone also violated the separate state CAPP at LAC 33:III.5901.A, which incorporates 40 C.F.R. § 68.73(d) by reference.

Subclaim 13C: Pressure Relieving Devices
(40 C.F.R. § 68.73(d), LAC 33:III.5901.A)

510.    Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 97-129, 183-198, 230-232, 248-252, and 265-268 as if fully set forth herein.

511.    In accordance with good engineering practices, unless documented experience and/or an RBI assessment indicates that a longer interval is acceptable, test and inspection intervals for pressure-relieving devices in typical process services shall not exceed five years for typical process services. Section 6.6.2.2 of API 510 Standard Pressure Vessel Inspection Code.

512.    According to the July 20, 2008 Instrument Tech form, Firestone inspected pressure relief valve SV-02-28 on July 2008.

513.    Firestone was required to conduct another inspection of pressure relief valve SV-02-28 by July 2013.

514.    According to the April 25, 2016 Instrument Tech form, Firestone did not conduct another inspection of pressure relief valve SV-02-28 until April of 2016 and the inspection was past due.

515.     Firestone did not inspect pressure relief valve SV-02-28 within five years of its 2008 July inspection.

516.     As a result of its failure to timely conduct internal or on-stream inspections and other inspections of pressure-relieving devices in accordance with good engineering practices between 2013 and 2016, Firestone violated the federal CAPP at 40 C.F.R. § 68.73(d). Firestone also violated the separate state CAPP at LAC 33:III.5901.A, which incorporates 40 C.F.R. § 68.73(d) by reference.

517.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for injunctive relief and civil penalties for these federal CAPP violations at Subparts 13A through 13C, which occurred between 2013 and 2017. Pursuant to La. R.S. 30:2025, Firestone is liable to LDEQ for injunctive relief and civil penalties for the state CAPP violations at Subparts 13A through 13C.

## FOURTEENTH CLAIM FOR RELIEF

### Failure to Conduct Complete and Timely PHA

Failure to Conduct Timely PHAs
(40 C.F.R. § 68.67(f), LAC 33:III.5901.A)

518.     Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 97-129, 183-198, 230-232, 248-252, and 265-268 as if fully set forth herein.

519.     Pursuant to 40 C.F.R. § 68.67(f), Firestone was required to update and revalidate each PHA at least every five years after the completion of the initial PHA.

520.     According to Firestone's PHA List and Schedule, Firestone failed to update and revalidate the following PHAs within five years of the previous PHA review.

| Failure to Conduct PHAs Every 5 Years | | | |
|---|---|---|---|
| Process Area | Date of PHA | Date of Next PHA | Time Beyond 5-Year Deadline |

| Purification Unit | May 2009 | August 2014 | 3 months |
| Catalyst Storage | September 2009 | January 2015 | 4 months |
| 400 Area Polymerization | September 2009 | March 2015 | 6 months |
| No. 7 Crumb Desolventization Line | May 2010 | June 2015 | 1 month |
| No. 8 Crumb Desolventization Line | May 2010 | June 2015 | 1 month |
| Batch Reactor Area | September 2010 | October 2015 | 1 month |
| Flare System | September 2010 | October 2015 | 1 month |
| Blend Tanks | November 2010 | December 2015 | 1 month |

521.     As a result of Firestone's failure to conduct the aforementioned PHA reviews within five years of the previous PHA review, Firestone violated the federal CAPP at 40 C.F.R. § 68.67(f).  Firestone also violated the separate state CAPP at LAC 33:III.5901.A, which incorporates 40 C.F.R. § 68.67(f) by reference.

522.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for civil penalties for these federal CAPP violations, which occurred in 2014 and 2015. Pursuant to La. R.S. 30:2025(E)(1)(a), Firestone is liable to LDEQ for civil penalties for the state CAPP violations set forth above.

### FIFTEENTH CLAIM FOR RELIEF

### Failure to Conduct Timely Compliance Audits
(40 C.F.R. § 68.79(a), LAC 33:III.5901.A)

523.     Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 97-129, 183-198, 230-232, 248-2523, and 265-268 as if fully set forth herein.

524.     According to the September 2010 Risk Management Plan Compliance Audit Report, Firestone conducted a Risk Management Plan Compliance Audit from March 8-10, 2010.

525.     Firestone was required to conduct another Risk Management Plan Compliance Audit in March 2013.

526.     According to the November 18, 2013 Risk Management Plan Compliance Audit Report, Firestone did not conduct another Risk Management Plan Compliance Audit until August 12-16, 2013.

527.     Given that Firestone completed a Risk Management Plan Compliance Audit in August 2013, Firestone was required to conduct another Risk Management Plan Compliance Audit in August 2016.

528.     According to its January 2017 Risk Management Plan, Firestone conducted its next Risk Management Plan Compliance Audit on September 1, 2016.

529.     As a result of its failure to conduct timely Risk Management Plan Compliance Audits on two occasions between 2013 and 2016, Firestone violated the federal CAPP at 40 C.F.R. § 68.79(a). Firestone also violated the separate state CAPP at LAC 33:III.5901.A, which incorporates 40 C.F.R. § 68.79(a) by reference.

530.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for civil penalties for these federal CAPP violations, which occurred between 2013 and 2016. Pursuant to La. R.S. 30:2025(E)(1)(a), Firestone is liable to LDEQ for civil penalties for the state CAPP violations set forth above.

### SIXTEENTH CLAIM FOR RELIEF

### Failure to Make Procedures Readily Accessible

Procedures Not Readily Accessible
(40 C.F.R. § 68.69(b), LAC 33:III.5901.A)

531.     Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 97-129, 183-198, 230-232, 248-252, and 265-268 as if fully set forth herein.

532.     Pursuant to 40 C.F.R. § 68.69(b), Firestone is required to ensure that operating procedures are readily accessible to employees at all times, including during a power outage.

533.     At the time of the NEIC Inspection in April of 2016, Firestone kept electronic copies of the Facility's operating procedures, which include emergency shutdown procedures, on Facility computers throughout the Facility.

534.     At the time of the NEIC Inspection in April of 2016, Firestone kept one hard copy of the operating procedures in the Process Control Coordinator's office located in the laboratory building.

535.     In the event of a power outage, employees who work in or maintain a process would not have had access to emergency operation, shutdown or other critical operating procedures.

536.     In the event of a power outage, employees who work in or maintain a process would have been required to go to the laboratory building to review a hard copy of the emergency procedures.

537.     As a result of its failure to make the Facility's Operating Procedures readily accessible to Facility employees during a power outage, Firestone violated the federal CAPP at 40 C.F.R. § 68.69(b). Firestone also violated the separate state CAPP at LAC 33:III.5901.A, which incorporates 40 C.F.R. § 68.69(b).

538.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for civil penalties for these federal CAPP violations in 2016. Pursuant to La. R.S. 30:2025(E)(1)(a), Firestone is liable to LDEQ for civil penalties for the state CAPP violations set forth above.

## SEVENTEENTH CLAIM FOR RELIEF

### Failure to Provide Accurate and Updated Risk Management Plan

#### Subclaim 17A: Failure to Correct Risk Management Plan

(40 C.F.R. § 68.195, LAC 33:III.5901.A)

539.    Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 97-129, 183-198, 230-232, 248-2523, and 265-268 as if fully set forth herein.

540.    Pursuant to 40 C.F.R. § 68.195, Firestone was required to submit corrections to its risk management plan emergency contact information within one month of changing the emergency point of contact.

541.    During the 2016 NEIC Inspection, EPA noted that the risk management plan listed Gene Stevens, health and safety manager, as the emergency contact.

542.    According to statements made by Firestone employees to NEIC Inspectors in April of 2016, Mr. Stevens left the Facility in 2014, and Dondi Quarles replaced Mr. Stevens as the emergency contact.

543.    Based upon information obtained from the 2016 NEIC Inspection, Firestone did not update its risk management plan with a new emergency contact, Dondi Quarles, until April 18, 2016.

544.    Firestone failed to correct its risk management plan to list a new emergency point of contact within one month of Mr. Stevens' leaving and Dondi Quarles becoming the emergency point of contact.

545.    As a result of Firestone's failure to correct its risk management plan within one month of a change in the designated emergency point of contact, Firestone violated the federal CAPP at 40 C.F.R. § 68.195, the state CAPP at LAC 33:III.5901.A, which incorporates 40 C.F.R. § 68.195 by reference.

Subclaim 17B: Failure to Provide a Complete Risk Management Plan
(40 C.F.R. § 68.160(b)(6), LAC 33:III.5901.A)

546.     Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 97-129, 183-198, 230-232, 248-2523, and 265-268 as if fully set forth herein.

547.     Pursuant to 40 C.F.R. § 68.160(b)(6), Firestone was required to provide the email address of the emergency point of contact when submitting the Facility's risk management plan.

548.     The Facility's 2016 risk management plan lists Dondi Quarles as the Facility's emergency point of contact.

549.     The 2016 risk management plan does not, however, include Mr. Quarles' email address.

550.     As a result of Firestone submitting a risk management plan that does not include the email address of the emergency point of contact, Firestone violated the federal CAPP at 40 C.F.R. § 68.160(b)(6), the state CAPP at LAC 33:III.5901.A, which incorporates 40 C.F.R. § 68.160(b)(6) by reference.

551.     Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for civil penalties for Subclaims 17A and 17B, which occurred between 2014 and 2016. Pursuant to La. R.S. 30:2025(E)(1)(a), Firestone is liable to LDEQ for civil penalties for Subclaims 17A and 17B.

### *NSPS Subpart Db*

### **EIGHTEENTH CLAIM FOR RELIEF**

### **Failure to Timely Submit PEMS Plans and Excess Emissions Reports for Boilers**

Subclaim 18A: 2013-2015 Violation for Late B-100 Boiler Predictive
Emissions Monitoring System Plan
(40 C.F.R. § 60.49b(c), Federal Operating Permit,
LAC 33:III.501.C.4, and LAC 33:III.507.B.2)

552.     Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 130-176, 183-198, 230-232, 253-261, and 265-268 as if fully set forth herein.

553.   Firestone was required to submit a PEMS plan to EPA for the B-100 boiler within 360 days of the boiler's startup date.

554.   The startup date for the B-100 boiler was October 4, 2012.

555.   Firestone was required to submit a PEMS plan for the B-100 boiler by October 4, 2013.

556.   Firestone submitted the PEMS plan for the B-100 boiler on December 18, 2015, 805 days after the deadline to submit the plan.

557.   As a result of its failure to submit the PEMS plan for the B-100 boiler within 360 days of the initial startup of the B-100 boiler from October 4, 2013 to December 18, 2015, Firestone violated 40 C.F.R. § 60.49b(c), SR 119 of the V4 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

Subclaim 18B: 2013-2016 Violation for Late Excess Emissions Reports
(40 C.F.R. § 60.49b(w), Federal Operating Permits,
LAC 33:III.501.C.4, LAC 33:III.507.B.2)

558.   Plaintiffs reallege and incorporate by reference Paragraphs 1-24, 130-198, 230, 232, and 253-268 as if fully set forth herein.

559.   Pursuant to 40 C.F.R. § 60.49b(w), Firestone is required to submit PEMS excess emissions reports to EPA by the 30th day following the end of the reporting period.

560.   The following table details the due dates, postmark dates, and days late for the PEMS excess emissions reports for Boilers B-100 and B-900:

| Reporting Period | Report Due Date | Postmark Date | Days Late |
|---|---|---|---|
| 2H 2013 | 1/30/14 | 3/31/15 | 425 |
| 1H 2014 | 7/30/14 | 3/31/15 | 244 |
| 1H 2015 | 7/30/15 | 10/1/15 | 63 |
| 2H 2015 | 1/30/16 | 3/31/16 | 61 |
| 1H 2016 | 7/30/16 | 9/30/16 | 62 |
| 2H 2016 | 1/30/17 | 4/18/17 | 78 |

561.    As a result of Firestone's failure to submit the aforementioned PEMS excess emissions reports to EPA by their reporting deadlines, Firestone violated 40 C.F.R. § 60.49b(w), SRs 100 and 121 of the V4 Federal Operating Permit, SRs 99 and 120 of the V5 Federal Operating Permit, LAC 33:III.501.C.4, and LAC 33:III.507.B.2.

562.    Pursuant to Section 113 of the CAA, 42 U.S.C. § 7413(b), Firestone is liable to the United States for civil penalties for Subclaims 18A and 18B, which occurred between 2013 and 2016. Pursuant to La. R.S. 30:2025(E)(1)(a), Firestone is liable to LDEQ for civil penalties for Subclaims 18A and 18B.

### *LDEQ-ONLY CLAIMS*
### NINETEENTH CLAIM FOR RELIEF

### Failure to Operate within Permitted Emission Rates and Limits;
### Failure to Prevent Facility Spills, Leaks, and Releases;
### Failure to Maintain Housekeeping and Maintenance Practices; and
### Failure to Submit Timely Reports

Subclaim 19A: Flare Cap 2014 and 2016 Methyl Ethyl Ketone
Permit Limit Exceedances and Emissions of Unpermitted Pollutants
(LAC 33:III.501.C.2 and 4, Federal Operating Permits)

563.    LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

564.    Pursuant to the Facility's V3 Federal Operating Permit, the Facility was not authorized to discharge any methyl ethyl ketone ("MEK"), which is a toxic air pollutant under LAC 33:III.5112, Table 51.1, from its Flare Header System.

565.    Firestone's 2013, 2014, and 2016 ERIC Emission Inventory data indicates the following emissions exceedances and emissions of unpermitted pollutants of MEK from the Facility's Flare Header System CAP:

| Pollutant | Year | Permit Number(s) | Permit Limit | Actual Emissions | Permit Exceedance |
|---|---|---|---|---|---|
| | | | (lbs/yr) | (lbs/yr) | (lbs/yr) |
| MEK | 2013 | V3 Permit | NP | 47.99 | 47.99 |
| | 2014 | V3 Permit | NP | 42.26 | 42.26 |
| | 2016 | V4 & V5 Permits | 40 | 51.35 | 11.35 |

566.    As a result of exceeding the permit limit and emitting unpermitted pollutants from the Facility's Flare Header System in 2013, 2014, and 2016, Firestone violated LAC 33:III.501.C.2 and 4 and the V3-V5 Federal Operating Permits.

Subclaim 19B: Flare Cap 2010 Permit Limit Exceedances
(Federal Operating Permits, LAC 33:III.501.C.4)

567.    LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 2567-2612, and 265-268 as if fully set forth herein.

568.    Pursuant to the V1AA-V2 Federal Operating Permits, the Facility was required to comply with specific emission limits for the Flare Header System in 2010, as specified in the table below.

569.    On October 20, 2010, Firestone received a variance that modified its Flare Header System emission limits for VOCs, n-hexane 1,3-butadiene, and styrene.

570.    Even with the variance, Firestone's operations resulted in the following emission exceedances from the Facility's Flare Header System in 2010:

| Pollutant | Year | Permit Number(s) | Permitted Emissions | Reported Emissions | Permit Exceedance |
|---|---|---|---|---|---|
| Criteria Pollutants | | | (tpy) | (tpy) | (tpy) |
| VOC | 2010 | V1AA and V2 Permits | 11.27 | 13.07 | 1.8 |
| HAPs | | | (lbs/yr) | (lbs/yr) | (lbs/yr) |
| n-hexane | 2010 | V1AA and V2 Permits | 12,040 | 15,580 | 3,540 |
| 1,3-butadiene | 2010 | V1AA and V2 Permits | 1,580 | 1,740 | 160 |
| Styrene | 2010 | V1AA and V2 Permits | 600 | 900 | 300 |

571.     As a result of Firestone exceeding permitted emission limits for the Facility Flare Header System, Firestone violated LAC 33:III.501.C.4 and the V1AA-V2 Federal Operating Permits.

### Subclaim 19C: Permit Emission Rate Exceedances at the Flare
(Federal Operating Permit, LAC 33:III.501.C.4)

572.     LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 2567-2612, and 2656-268 as if fully set forth herein.

573.     From September 9, 2010 through October 19, 2010, Firestone was required by the V2 Federal Operating Permit to comply with the following permitted maximum emission rates for Facility flares: 100.10 pounds per hour of 1,3-butadiene, 0.16 pounds per hour of styrene, 47.58 pounds per hour of n-hexane, and 225.38 pounds per hour total VOC.

574.     During that same time period, the Facility's purification Recovery Column D-207 located in Area 200 was rendered inoperable due to excess fouling of the column's purification trays.  All feed to this column was diverted to the Primary Flare.

575.     As a result, during that same time period, the Facility emitted:

a.   100.41 pounds per hour of 1,3-butadiene, or 0.31 pounds per hour above the 1,3-butadiene permitted emission rate;

b.   0.76 pounds per hour of styrene, or 0.6 pounds per hour above the styrene permitted emission rate;

c.   54.47 pounds per hour of n-hexane, or 6.89 pounds per hour above the n-hexane permitted emission rate; and

d.   233.18 pounds per hour total VOC, or 7.8 pounds per hour above the VOC permitted emission rate.

576.     As a result of its failure to comply with flare permitted emission rates, Firestone violated LAC 33:III.501.C.4and the V2 Federal Operating Permit.

### Subclaim 19D: 2016 Release of N-Hexane from Gasket

(LAC 33:III.905, LAC 33:III.501.C.4, Federal Operating Permit)

577.    LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-2612, and 265-268 as if fully set forth herein.

578.    Based on Firestone's reporting in the second 2016 Semiannual Title V Deviation Report, on November 15, 2016, a gasket failed in one of the eight Crumb strainers resulting in a seeping leak.

579.    The gasket failure resulted in the release of an estimated 25 gallons of polymer cement (rubber hexane), which resulted in a release of 184 pounds of n-hexane.

580.    As evidenced by  the release of n-hexane, Firestone failed to use and diligently maintain its air pollution control facilities in proper working order. Therefore, Firestone violated LAC 33:III.905, LAC 33:III.501.C.4, and SR 291 of the V5 Federal Operating Permit.

### Subclaim 19E: 2016 Release of N-hexane from Pipe Nipple Failure
(LAC 33:III.2113.A, Federal Operating Permit, LAC 33:III.501.C.4)

581.    LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-2612, and 265-268 as if fully set forth herein.

582.    Based on Firestone's reporting in the second 2016 Semiannual Title V Deviation Report, on November 7, 2016, a truck ran into a pipe rack, causing an instrument air-line to leak and all valves in areas 400, 1400, and 2000 to shut down, resulting in an increase of pressure. The sudden increase in pressure put additional stress on the schedule 160 pipe nipple, causing the nipple to fail.

583.    The pipe nipple failure resulted in the release of 855 pounds of n-hexane.

584.    As evidenced by the release of n-hexane, Firestone failed to maintain best practical housekeeping and maintenance practices at the highest possible standards to reduce the

quantity of organic compounds emissions and therefore violated LAC 33:III.2113.A, SR 281 of the V4 Federal Operating Permit, and LAC 33:III.501.C.4.

Subclaim 19F: 2017 N-hexane Release after Leak from Number 6 Crumb Unit Condenser
(LAC 33:III.905, LAC 33:III.501.C.4, SR 291 of the V5 Federal Operating Permit)

585.    LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

586.    Based on Firestone's reporting in the first 2017 Semiannual Title V Deviation Report, on February 17, 2017, the Number 6 Crumb Unit condenser leaked n-hexane into the cooling water when the condenser was operating with a higher than normal operating pressure.

587.    Firestone reported that the duration of the event was 35 minutes.

588.    The condenser leak resulted in the estimated release of 100 lbs of n-hexane from the South Cooling Towers.

589.    At the time of the incident, the current permit, V5 Federal Operating Permit, limited the maximum n-hexane emission rate from the South Cooling Tower to 0.61 lbs/hr.

590.    Based upon the 100 lbs released in the 35 minutes of the event, Firestone released n-hexane at a rate of 171 lbs/hr.

591.    By not maintaining proper operating pressure of the condenser, Firestone failed to properly install or implement its air pollution control facilities and thus violated LAC 33:III.905, SR 291 of the V5 Federal Operating Permit, and LAC 33:III.501.C.4.

Subclaim 19G: 2017 N-hexane Release from Cement Strainers
(LAC 33:III.905, LAC 33:III.501.C.4, Federal Operating Permit)

592.    LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

593.     Based on Firestone's reporting in the first 2017 Semiannual Title V Deviation Report, on March 2, 2017, Firestone caused a leak of n-hexane while cleaning cement strainers.

594.     The leak resulted in the release of approximately 28.93 pounds of n-hexane.

595.     As evidenced by the release of n-hexane, Firestone failed to use and diligently maintain its air pollution control facilities in proper working order. Therefore, Firestone violated LAC 33:III.905, LAC 33:III.501.C.4, and SR 291 of the V5 Federal Operating Permit.

### Subclaim 19H: 2017 1,3-Butadiene Release as a Result of Spill from G510B
(LAC 33:III.905, LAC 33:III.501.C.4, Federal Operating Permit)

596.     LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

597.     Based on Firestone's reporting in the first 2017 Semiannual Title V Deviation Report, on April 1, 2017, Firestone opened a feed valve on a crumb rubber strainer that was not properly secured, resulting in a spill of 1,3-butadiene, cyclohexane, and n-hexane from G510B.

598.     The opening of the feed valve resulted in the release of 0.0986 pounds of 1,3-butadiene, 14.94 pounds of cyclohexane, and 0.87 pounds of n-hexane.

599.     As evidenced by the release of 1,3-butadiene, cyclohexane, and n-hexane, Firestone failed to use and diligently maintain its air pollution control facilities in proper working order. Therefore, Firestone violated LAC 33:III.905, LAC 33:III.501.C.4, and SR 291 of the V5 Federal Operating Permit.

### Subclaim 19I: 2017 n-Hexane Release from Strainer
(LAC 33:III.905, LAC 33:III.501.C.4, Federal Operating Permit)

600.     LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

601.    Based on Firestone's reporting in the first 2017 Semiannual Title V Deviation Report, on April 17, 2017, Firestone over-pressured a strainer during purging, causing the lid to open and a release of n-hexane.

602.    The over-pressuring of the strainer resulted in the release of an estimated that 20 pounds of n-hexane.

603.    As evidenced by the release of n-hexane, Firestone failed to use and diligently maintain its air pollution control facilities in proper working order. Therefore, Firestone violated LAC 33: III.905, LAC 33:III.501.C.4, and SR 291 of the V5 Federal Operating Permit.

Subclaim 19J: 2017 n-Hexane Release from<br>Cooling Towers after Leak from Condensers<br>(LAC 33:III.905, LAC 33:III.501.C.4, and SR 291 of the V5 Federal Operating Permit)

604.    LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

605.    According to Firestone's first 2017 Semiannual Title V Deviation Report, on April 21, 2017, solvent leaked into the shell side of the solvent condensers in the Number 6 Crumb Unit during start up. The leak occurred because the inlet cooling water valve was inadvertently left in the closed position.

606.    The leak resulted in the release of 100 pounds of n-hexane above the permitted limit from Facility Cooling Towers.

607.    As evidenced by the release of n-hexane from Facility Cooling Towers, Firestone failed to use and diligently maintain its air pollution control facilities in proper working order. Therefore, Firestone violated LAC 33:III.905, LAC 33:III.501.C.4, and SR 291 of the V5 Federal Operating Permit.

Subclaim 19K: 2017 Styrene, Cyclohexane, n-hexane, and Toluene Release<br>During Loading of Tanker Car

(LAC 33:III.905, LAC 33:III.501.C.4, and SR 291 of the V5 Federal Operating Permit)

608.    LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

609.    Based upon Firestone's reporting, on May 1, 2017, Firestone overfilled a tanker truck while loading the truck.  The overfilling resulted in the release of styrene, cyclohexane, n-hexane, and toluene onto the tanker truck and into secondary containment.

610.    The overfilling of the tanker truck resulted in the release of the following HAPs: 30.97 pounds of styrene; 6.15 pounds of cyclohexane; 22.22 pounds of n-hexane; and 0.4 pounds of toluene.

611.    As evidenced by the release of styrene, cyclohexane, n-hexane, and toluene, Firestone failed to use and diligently maintain its air pollution control facilities in proper working order. Therefore, Firestone violated LAC 33:III.905, LAC 33:III.501.C.4, and SR 291 of the V5 Federal Operating Permit.

<u>Subclaim 19L: 2017 Styrene, Cyclohexane, n-Hexane, Toluene, and 1,3-Butadiene Release during Installation of Portable Nitropropane Tank</u>
(LAC 33:III.905, LAC 33:III.501.C.4, and SR 291 of the V5 Federal Operating Permit)

612.    LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

613.    Based on Firestone's reporting, on May 15, 2017, Firestone released styrene, cyclohexane, n-hexane, toluene, and 1,3-butadiene during the installation of portable nitropropane tank, F-712. The bypass line around the tanks pressure relief valve was inadvertently left open allowing venting from the header to escape to the atmosphere through the temporary flex hose.

614.    Firestone's actions resulted in the release of an estimated: 0.04 pounds of styrene; 0.39 pounds of cyclohexane; 3.00 pounds of n-hexane; 0.1 pounds of toluene; and 4.17 pounds of 1,3-butadiene.

615.    As evidenced by the release of styrene, cyclohexane, n-hexane, toluene, and 1,3-butadiene, Firestone to use and diligently maintain its air pollution control facilities in proper working order. Therefore, Firestone violated LAC 33:III.905, LAC 33:III.501.C.4, and SR 291 of the V5 Federal Operating Permit.

<u>Subclaim 19M: 2017 Cyclohexane Release on a Line from Tank 35</u>
(LAC 33:III.905, LAC 33:III.501.C.4, SR 291 of the V5 Federal Operating Permit)

616.    LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

617.    Based on Firestone's reporting, on June 29, 2017, during routine operator rounds, Firestone discovered a leak of cyclohexane on a line from Tank 35.

618.    The release resulted in an estimated 10 pounds of cyclohexane.

619.    As evidenced by the release of cyclohexane, Firestone to use and diligently maintain its air pollution control facilities in proper working order. Therefore, Firestone violated LAC 33:III.905, LAC 33:III.501.C.4, and SR 291 of the V5 Federal Operating Permit.

<u>Subclaim 19N: Failure to Inspect Emergency Shutdown Alarm</u>
(LAC 33:III.5901.A (incorporating 40 C.F.R. § 68.73(b) by reference),
LAC 33:III.501.C.4, SR 336 of the V2 Federal Operating Permit)

620.    LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

621.    Pursuant to 40 C.F.R. § 68.73(b), Firestone was required to establish and implement written procedures to maintain ongoing integrity of process equipment.

622.     According to LDEQ August 21, 2012 CAPP Inspection Report, Firestone procedure MI3-Controls (Revision 3 dated November 23, 2011) required testing and inspections of monitoring devices, sensors, detectors, alarms including audible alarms, and interlocks every three months.

623.     Based upon information and belief, Firestone failed to inspect emergency shutdown alarm LSH 04-0453 in the 3rd quarter of 2011.

624.     In failing  to inspect shutdown alarm LSH 04-0453, Firestone failed to implement written procedure MI-3-Controls and violated LAC 33:III.5901.A, which incorporates by reference 40 C.F.R. § 68.73(b), LAC 33:III.501.C.4, and SR 336 of the V2 Federal Operating Permit.

<u>Subclaim 19O: Failure to Maintain Best Practical Housekeeping<br>and Maintenance Practices when Loading Styrene Mixture into Tanker Truck</u><br>(LAC 33:III.2113.A, Federal Operating Permit,<br>LAC 33:III.501.C.4)

625.     LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

626.     On May 26, 2010, Firestone reported a release of 1,428 lbs. of styrene into the atmosphere when, during the loading of a styrene mixture into a tanker truck vessel for shipment, a styrene-based chemical reaction occurred inside the tanker truck that caused elevated temperatures inside the vessel and resulted in the release of styrene.

627.     In failing to maintain best practical housekeeping and maintenance practices at the highest possible standards to reduce the quantity of organic compound emissions, Firestone violated LAC 33:III.2113.A, SR 310 of the V2 Federal Operating Permit, and LAC 33:III.501.C.4.

<u>Subclaim 19P: Failure to Maintain Best Practical Housekeeping</u>

and Maintenance Practices for the Chill Water System
(LAC 33:III.2113.A, SR 310 of the V2 Federal Operating Permit, LAC 33:III.501.C.4)

628.     LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

629.     According to its first 2011 Semiannual Title V Deviation Report, on January 24, 2011, Firestone discovered a leak from the chill water system.

630.     Firestone determined that a tube at one of the heat exchangers leaked, causing the unauthorized discharge of 87 pounds of n-hexane.

631.      In failing to maintain best practical housekeeping and maintenance practices at the highest possible standards to reduce the quantity of organic compound emissions, Firestone violated LAC 33:III.2113.A, SR 310 of the V2 Federal Operating Permit, and LAC 33:III.501.C.4.

Subclaim 19Q: Release of n-Hexane and 1,3-Butadiene during Transfer to Crumbing Tank
(LAC 33:III.905, LAC 33:III.501.C.4, SR 279 of V3 Federal Operating Permit)

632.     LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

633.     On May 16, 2012, Firestone found a leaking pipe at a crack in a weld while transferring rubber cement to crumbing tanks, resulting in the unauthorized discharge of 2,092 pounds of n-hexane and 35 pounds of 1,3-butadiene.

634.     In failing to use and diligently maintain its air pollution control facilities in proper working order, Firestone violated LAC 33:III.905, LAC 33:III.501.C.4, and SR 279 of the V3 Federal Operating Permit.

Subclaim 19R: Failure to Timely Submit Leak Detection
and Repair ("LDAR") Semiannual Reports
(LAC 33:III.2122.G, LAC 33:III.501.C.4, Federal Operating Permit)

635.     LDEQ realleges and incorporates by reference Paragraphs 1-24, 143-176, 183-198, 230-232, 256-261, and 265-268 as if fully set forth herein.

636.     Pursuant to LAC 33:III.2122.G, Firestone was required to submit an LDAR report semiannually to OES. The reports are due by the last day of the month (January and July) following the monitoring period or by an alternate date approved by the administrative authority.

637.     According to LDEQ's 2014 file review of the Facility's records, Firestone reported that it failed to timely submit the first 2013 and second 2013 LDAR semiannual reports.

638.     LDEQ noted that the First 2013 report was due on July 31, 2013, but it was postmarked September 23, 2013, which was fifty-four (54) days late.

639.     LDEQ noted that the Second 2013 report was due on January 31, 2014, but it was postmarked on March 26, 2014, which was fifty-four (54) days late.

640.     In failing to timely submit the Facility's first 2013 and second 2013 LDAR semiannual reports, Firestone violated LAC 33:III.2122.G, LAC 33:III.501.C.4, and SR 146 of the V3 Federal Operating Permit.

Subclaim 19S: Failure to Submit Timely NESHAP Subpart U Periodic Reports
(LAC 33:III.5122.A (incorporating 40 C.F.R. § 63.506(e)(6)(i) by reference)

641.     LDEQ realleges and incorporates by reference Paragraphs 1-24, 183-198, 230-232, and 265-268 as if fully set forth herein.

642.     Pursuant to 40 C.F.R. § 63.506(e)(6)(i), Firestone was required to submit semiannual Periodic Reports no later than 60 days after the end of each six-month period.

643.     The following table details the due dates, postmark dates, and days late for the NESHAP Subpart U Periodic Reports:

| Reporting Period | Report Due Date | Postmark Date | Days Late |
|---|---|---|---|
| 1st 2009 | 7/18/09 | 7/20/09 | 2 |

| 2nd 2010 | 1/18/11 | 1/19/11 | 1 |
| 2nd 2012 | 1/18/13 | 1/21/13 | 3 |
| 1st 2013 | 7/18/13 | 9/30/13 | 74 |

644.    In failing to submit NESHAP Subpart U Periodic Reports by their due dates, Firestone violated LAC 33:III.5122.A, which incorporates by reference 40 C.F.R. § 63.506(e)(6)(i).

645.    Pursuant to La. R.S. 30:2025(E)(1)(a), Firestone is liable to LDEQ for civil penalties for Subclaims 19A through 19S, which occurred between 2009 and 2017.

### *EPCRA AND PPA CLAIMS*
### TWENTIETH CLAIM FOR RELIEF

### Failure to Use Readily Available Data or Make Reasonable Estimates when Providing n-Hexane Stack/Point Emissions in Form R Submittals for Reporting Years 2013, 2014, and 2015
(42 U.S.C. § 11023(g)(2))

646.    The United States realleges and incorporates by reference Paragraphs 1-23, 199-221, 230, and 269-2801 as if fully set forth herein.

647.    Pursuant to 40 C.F.R. § 372.30(a), Firestone was required to annually complete a Form R for each toxic chemical known by the owner or operator to be manufactured (including imported), processed, or otherwise used in excess of the applicable threshold.

648.    Pursuant to 42 U.S.C. § 11023(g)(2), in order to provide the information required in the Form R, Firestone may use readily available data collected pursuant to other provisions of law, or, where such data are not readily available, reasonable estimates of the amounts involved.

649.    According to Firestone's "Points and Pollutants (in tons)" worksheet in ERIC for reporting years ("RYs") 2013 – 2015, Firestone relied upon 1995-1996 stack test data when calculating emissions from Facility dryers and submitting its Form R for 2013-2015.

650.    According to Firestone's prevention of significant deterioration permit No. PSD-LA-672, in 2003 the Facility was permitted to replace and upgrade Facility dryer lines, improve feedstock delivery systems, improve delivery systems to the strippers, improve crumb rubber delivery systems, and increase annual production by 22 million pounds.

651.    The equipment used in the Facility Dryers changed between 1996 and 2013, making the stack test data no longer representative.

652.    According to the Facility's business records, Firestone had data in the form of residual HAP crumb rubber sampling results and production data when calculating Facility Dryer emissions for RYs 2013-2015.

653.    Firestone could have used its residual HAP crumb rubber sampling results and production data to accurately calculate Facility Dryer emissions for RYs 2013-2015.

654.    Firestone failed to use available data to accurately calculate n-hexane emissions from Facility Dryers for RYs 2013-2015.

655.    Firestone failed to accurately calculate n-hexane emissions from Facility Dryers for RYs 2013-2015 as shown below:

| Pollutant | Year | Dryer Emissions Used for TRI Reporting Based on 1995-1996 Stack Test Factors (tpy) | Dryer Emissions Using Residual HAP Sampling Data and Production Data (tpy) | Underreported Dryer Emissions (tpy) | Underreported Dryer Emissions (lbs/yr) |
|---|---|---|---|---|---|
| n-hexane | 2013 | 604.2 | 878.8 | 274.6 | 549,200 |
|  | 2014 | 606.8 | 887.9 | 281.1 | 562,200 |
|  | 2015 | 569.7 | 849.3 | 279.6 | 559,200 |

656.    Firestone's inaccurate calculation of n-hexane emissions from Facility Dryers for RYs 2013-2015 led to inaccurate reporting of n-hexane stack/point air emissions on the Form R for RYs 2013-2015.

657.    Therefore, Firestone failed to use readily available data and/or make a reasonable estimate of stack/point source emissions in violation of 42 U.S.C. § 11023(g)(2) for RYs 2013-2015.

658.    Pursuant to Section 325(c)(1) of EPCRA, 42 U.S.C. § 11045(c)(1), Firestone is liable to the United States for civil penalties for these violations that occurred from RYs 2013 through 2015.

## TWENTY-FIRST CLAIM FOR RELIEF

### Failure to Report in Form R Submittals the On-site Recycling of n-Hexane for RYs 2013, 2014, 2015, and 2016
(42 U.S.C. § 13106(b)(2))

659.    The United States realleges and incorporates by reference Paragraphs 1-23, 199-221, 230, and 269-2801 as if fully set forth herein.

660.    According to Firestone's V3 Federal Operating Permit, the Facility used solution polymerization to manufacture rubber polymer, and then stripped a mixture of n-hexane, 1,3-butadiene, water, and styrene ("n-hexane mixture") from that polymer.

661.    According to Firestone's V3 Federal Operating Permit, the stripped n-hexane mixture was sent to the purification unit, which purified the n-hexane by using a series of distillation towers.

662.    According to Firestone's V3 Federal Operating Permit, once the n-hexane was recovered from the distillation towers, Firestone then used the recovered n-hexane again in the polymerization process.

663.    Firestone recycled n-hexane on-site during RYs 2013-2016 but did not include that information in Part II, Section 7C and Section 8.4 of the Form R reports for those years.

664.     As a result of failing to report its recycling of n-hexane in its Form Rs for RYs 2013-2016, Firestone violated Section 6607(b)(2) of the PPA, 42 U.S.C. § 13106(b)(2) (referencing Section 313(a) of EPCRA, 42 U.S.C. § 11023).

665.     Pursuant to Section 6607(c) of the PPA (referencing Section 325(c)(1) of EPCRA), 42 U.S.C. § 13106(c) (referencing 42 U.S.C. § 11045(c)(1)), Firestone is liable to the United States for civil penalties for these violations that occurred from RYs 2013 through 2016.

## TWENTY-SECOND CLAIM FOR RELIEF

### Failure to Immediately Notify and Submit Written Follow-Up Notifications of Releases of Hazardous Substances to the LEPC and the SERC
(40 C.F.R. §§ 355.33 and 355.40)

666.     The United States realleges and incorporates by reference Paragraphs 1-23, 199-221, 230, and 269-280 as if fully set forth herein.

667.     Pursuant to 40 C.F.R. § 302.4, 1,3-butadiene is a CERCLA hazardous substance and has a reportable quantity of ten pounds.

668.     According to the Facility's Heat Exchanger Testing Reports and the NEIC Inspection in April of 2016, the Facility's Heat Exchange Systems experienced the following six leaks of 1,3-butadiene that exceeded the reportable quantity in a 24-hour period during 2013, 2015 and 2016:

| Cooling Tower | Leak Date | 1,3-butadiene (pounds per day) | Duration of Leak (days) | Total Emitted (pounds) | Immediate Notification | Written Follow-up |
|---|---|---|---|---|---|---|
| North | 4/26/13 | 777 | 33 | 25,650 | None | None |
| North | 11/18/13 | 704 | 33 | 23,244 | None | None |
| South | 4/23/15 | 426 | 60 | 25,616 | None | None |
| South | 6/23/15 | 791 | 36 | 28,495 | None | None |
| South | 9/16/15 | 634 | 75 | 47,607 | None | None |
| South | 2/18/16 | 422 | 43 | 21,554 | Late (4/1/16) | 4/8/16 |

669.    Pursuant to 40 C.F.R. § 355.40, Firestone was required to immediately notify LEPC and SERC of releases of 1,3-butadiene that exceed the reportable quantity and submit a written follow-up notification to provide additional information about the releases.

670.    Between 2013 and 2016, Firestone failed to immediately notify LEPC or SERC about six releases from the Facility's Heat Exchange Systems of 1,3-butadiene that exceeded the reportable quantity.

671.    Between 2013 and 2016 Firestone failed to submit follow-up written reports to LEPC or SERC regarding five releases from the Facility's Heat Exchange Systems of 1,3-butadiene that exceeded the reportable quantity.

672.    As a result of Firestone's failure to provide LEPC or SERC with required immediate notifications and written follow-up notifications from 2013-2016, Firestone violated Section 304 of EPCRA, 42 U.S.C. § 11004, and 40 C.F.R. §§ 355.33 and 355.40.

673.    Pursuant to Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), Firestone is liable to the United States for civil penalties for these violations, which occurred between 2013 and 2016.

### *CERCLA CLAIMS*
### TWENTY-THIRD CLAIM FOR RELIEF

### Failure to Immediately Notify the NRC
### of Releases of Hazardous Substances
(40 C.F.R. § 302.6)

674.    The United States realleges and incorporates by reference Paragraphs 1-23, 222-230, and 281-284 as if fully set forth herein.

675.    Firestone was required to immediately notify the NRC as soon as it had knowledge of any release of a hazardous substance from the Facility in a quantity equal to or

exceeding the reportable quantity determined by 40 C.F.R. Part 302 in a 24-hour period. 40

C.F.R. § 302.6.

676.    Pursuant to 40 C.F.R. § 302.4, 1,3-butadiene is a CERCLA hazardous substance

and has a reportable quantity of ten pounds.

677.    According to the Facility's Heat Exchanger Testing Reports, Firestone identified

multiple leaks from the Facility's Heat Exchange Systems that resulted in exceedances of the

reportable quantity for 1,3-butadiene between 2013 and 2016:

| Cooling Tower | Leak Date | 1,3-butadiene (pounds per day) |
|---|---|---|
| North | 4/26/13 | 777 |
| North | 11/18/13 | 704 |
| South | 4/23/15 | 426 |
| South | 6/23/15 | 791 |
| South | 9/16/15 | 634 |
| South | 2/18/16 | 422 |

678.    According to information obtained during the Inspection, Firestone did not notify

the NRC of these leaks from the Facility's Heat Exchange Systems that resulted in exceedances

of the reportable quantity for 1,3-butadiene between 2013 and 2016.

679.    As a result of Firestone's failure to provide NRC with required notifications,

Firestone violated Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), and 40 C.F.R. § 302.6 on

six occasions from 2013 to 2016.

680.    Pursuant to Section 109(c)(1) of CERCLA, 42 U.S.C. § 9609(c)(1), Firestone is

liable to the United States for civil penalties for these violations, which occurred between 2013

and 2016.

## PRAYER FOR RELIEF

WHEREFORE, the United States and LDEQ respectfully request that the Court provide

the following relief:

A.      Order Firestone to take all measures necessary to come into compliance with the CAA, EPCRA, CERCLA, and LEQA at the Lake Charles Facility.

B.      Permanently enjoin Firestone from operating the Lake Charles Facility except in accordance with the CAA, EPCRA, CERCLA, LEQA, and applicable regulatory requirements.

C.      Order Firestone to take other appropriate actions to remedy, mitigate, and offset the harm caused by their alleged CAA, EPCRA, CERCLA, and LEQA violations by, *inter alia*, requiring the Defendant to address or offset its unlawful emissions;

D.      Assess a civil penalty against Firestone of up to $37,500 per day for each violation of the CAA occurring after January 12, 2009 and through November 2, 2015; up to $97,284 per day for each violation of the CAA occurring after November 2, 2015; up to $99,681 per day for each violation that occurs after November 2, 2015 and that is assessed on or after February 6, 2019; and up to $32,500 per day for each violation of the LEQA;

E.      Assess a civil penalty against Firestone of up to $37,500 per day for each violation of the Section 304 of EPCRA occurring after January 12, 2009 and through November 2, 2015; and up to $59,017 per day for each violation that occurs after November 2, 2015. Additionally, in the case of a second or subsequent violation, assess a civil penalty against Firestone of up to $107,500 per day for each violation that occurs after January 12, 2009 and through December 6, 2013; up to $117,500 per day for each violation that occurs after December 6, 2013 and through November 2, 2015; and up to $177,053 per day for each violation that occurs after November 2, 2015;

F.      Assess a civil penalty against Firestone of up to $37,500 for each violation of the Section 313 of EPCRA occurring after January 12, 2009 and through November 2, 2015; and up to $54,789 for each violation of the CAA occurring after November 2, 2015;

G.      Assess a civil penalty against Firestone of up to $37,500 per day for each violation of the CERCLA occurring after January 12, 2009 and through 2, 2015; and up to $59,017 per day for each violation that occurs after November 2, 2015. Additionally, in the case of a second or subsequent violation, for each violation of Section 103 of CERCLA, assess a civil penalty against Firestone of up to $107,500 per day for each violation that occurs after January 12, 2009 and through December 6, 2013; up to $117,500 per day for each violation that occurs after December 6, 2013 and through November 2, 2015; and up to $177,053 per day for each violation that occurs after November 2, 2015;

H.      Award Plaintiffs their costs of this action; and

I.       Award Plaintiffs such other and further relief that the Court deems just and proper.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA:

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


9-30-2021 _____                  _s/ Thomas P. Carroll_____
Date                                        THOMAS P. CARROLL, D.C. BAR # 388593
                                            Assistant Section Chief
                                            CHERYL M. BARNETT
                                            Trial Attorney by Special Appointment
                                            Environmental Enforcement Section
                                            Environment and Natural Resources Division
                                            U.S. Department of Justice
                                            P.O. Box 7611
                                            Washington, D.C.  20044-7611
                                            (202) 532-3364
                                            thomas.carroll@usdoj.gov

ALEXANDER C. VAN HOOK
Acting United States Attorney
Western District of Louisiana


9-30-2021                    BY:    *s/ Desiree C. Williams*
Date                                DESIREE C. WILLIAMS (#30978)
                                    Assistant United States Attorney
                                    800 Lafayette Street, Suite 2200
                                    Lafayette, Louisiana 70501
                                    Telephone:  (337) 262-6618
                                    Facsimile:  (337) 262-6682
                                    Email:  desiree.williams@usdoj.gov


OF COUNSEL:
CARLOS EVANS
Assistant Regional Counsel
U.S. EPA, Region 6

FOR THE LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY:

9-30-2021 _____                    *s/ Brandon Williams* _____
Date                                  BRANDON WILLIAMS, Trial Attorney
                                      (La. Bar #27139)
                                      Michael Daniels, Trial Attorney
                                      (La. Bar #20775)
                                      Chanelle Collins
                                      (La. Bar #36832)
                                      Amber Litchfield, Attorney Supervisor
                                      (La. Bar #33866)
                                      Office of the Secretary, Legal Affairs Division
                                      Louisiana Department of Environmental Quality
                                      P.O. Box 4302
                                      Baton Rouge, Louisiana 70821-4302
                                      Phone: (225) 219-3985
                                      Fax: (225) 219-4068
                                      Mike.Daniels@la.gov